[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 173.]

OFFICE OF DISCIPLINARY COUNSEL *v.* FURTH.

[Cite as *Disciplinary Counsel v. Furth*, 2001-Ohio-1308.]

*Attorneys at law—Misconduct—Permanent disbarment—Myriad violations of Disciplinary Rules forming a distinct pattern of disregard for the courts, clients, and other professionals.*

(No. 00-2341—Submitted April 3, 2001—Decided September 19, 2001.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 99-03.

————————————

MOYER, C.J.

{¶ 1} On February 1, 1999, relator, Office of Disciplinary Counsel, filed a two-count complaint charging respondent, Thomas Craig Furth of Chagrin Falls, Ohio, Attorney Registration No. 0033870, with violating numerous Disciplinary Rules.  On September 9, 1999, relator filed an amended, eleven-count complaint alleging additional Disciplinary Rule violations.  Respondent answered through counsel and thereafter stipulated to a number of facts and exhibits.  The matter was heard by a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board").

{¶ 2} Counts 1 through 5 concern respondent's relationship with Scott Johnson.  On March 24, 1998, in Jonesboro, Arkansas, Mitchell Johnson, then age thirteen, and Andrew Golden, then age eleven, were involved in a shooting at Westside Middle School that left five people dead and ten others wounded.  The father of Mitchell Johnson is Scott Johnson, who lives in Grand Meadow, Minnesota.  Mitchell Johnson lives with Mr. Johnson's ex-wife in Jonesboro, Arkansas.

**{¶ 3}** The shooting quickly became the focus of national and worldwide media attention. Immediately upon learning of his son's involvement, Mr. Johnson traveled to Jonesboro. He described the media as being in a "feeding frenzy" and that he was repeatedly pressed for interviews.

**{¶ 4}** Count 1 concerns respondent's alleged improper solicitation and false claims of specialization and expertise. The panel found that respondent's employee, Leo Tomeu, began calling Mr. Johnson to solicit permission for respondent to be counsel of record for Mitchell Johnson. Mr. Johnson initially indicated that he was not interested in representation, but after Tomeu asked if he could fax some information regarding respondent, Mr. Johnson acquiesced.

**{¶ 5}** On March 27, 1998, respondent sent a letter to the public defenders assigned to represent Mitchell Johnson and Andrew Golden. In the letter, respondent stated that his "entire area of specialty and expertise is the representation of children and young adults in criminal matters," and that "[y]ou will not find anyone in the United States that is more of an expert in this regard than I am."

**{¶ 6}** On or about March 28, 1998, respondent faxed a letter to Mr. Johnson, specifically writing, **"[M]y entire specialty is representing children and young adults in (often major) criminal matters**" (emphasis *sic*), that "I am the very best at what I do," and that "[t]his is what I do, almost exclusively, and in numerous locations around the country." Shortly thereafter, Mr. Johnson agreed to retain respondent to represent Mitchell Johnson.

**{¶ 7}** On April 1, 1998, respondent appeared in the Chancery Court of Craighead County, Arkansas, Western District, Juvenile Division, for the purpose of gaining admission *pro hac vice* to represent Mitchell Johnson in charges relating to the shooting. At the hearing, respondent stated that he specialized in juvenile law, specifically stating to the judge, "[M]y entire specialty is in cases involving children."

**{¶ 8}** Subsequently, respondent and Mr. Johnson appeared on several national television shows. Respondent testified that Mr. Johnson insisted on making media appearances, while Mr. Johnson testified that it was at respondent's insistence that Mr. Johnson make the television appearances. As a result of these appearances, on April 15, 1998, the judge held a status conference relating to respondent's involvement in the case. Asked by the judge how he had become involved, respondent replied, "I sent Mr. Johnson a condolence note and my associate right here, did the same thing. He called us four or five days later, uh, he was on an airplane flying to New York to do a television appearance." During this hearing, the court removed respondent from any further participation as attorney of record for Mitchell Johnson. At the disciplinary hearing, respondent testified that he had sent Mr. Johnson a condolence letter but that when retaining respondent, Mr. Johnson was responding to the solicitation letter.

**{¶ 9}** Based on these facts, as to Count 1, the panel concluded that respondent had violated DR 2-105(A) (a lawyer shall not hold himself out publicly as a specialist or as limiting his practice), 2-103(A) (a lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a nonlawyer who has not sought his advice regarding employment of a lawyer, except as provided in DR 2-101), 2-101(F)(1) (a lawyer shall not make any solicitation of legal business in person or by telephone, except as provided in DR 2-103 and 2-104), and 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The panel dismissed one alleged violation under Count 1 for lack of clear and convincing evidence.

**{¶ 10}** Count 2 concerns respondent's neglect of legal matters regarding the Johnson case. The panel found that on or about May 29, 1998, respondent faxed a memorandum to Mr. Johnson recommending several specific legal actions. These included preparation and filing of a federal lawsuit on Mitchell's behalf against Craighead County for alleged violation of his civil rights, preparation and filing of

a federal lawsuit on respondent's behalf to ensure his ability to represent Mr. Johnson, preparation of a lawsuit against Mower County, Minnesota, on Mitchell's behalf, filing bar grievances with the state of Arkansas against the two public defenders, the judge who removed respondent from the Johnson case, and the prosecutor, announcement of "the rest of" Mitchell's legal team, and preparation of custody documents in the hiring of local Minnesota counsel to modify the custody order for Mr. Johnson's other son, Monte.

{¶ 11} Respondent never pursued any of the legal actions outlined in this memorandum and testified that he had never agreed to represent Mr. Johnson in these matters or file documents pertaining to them. Instead, respondent testified that he coordinated Mitchell Johnson's cases in various locations.

{¶ 12} Based on these facts, the panel concluded that the evidence was not clear and convincing that respondent had agreed to represent Mr. Johnson in the matters outlined in Exhibit 4 and found no neglect. Accordingly, the panel dismissed Count 2.

{¶ 13} Count 4 concerns respondent's advancing of financial assistance to Scott Johnson. The panel found that beginning in April 1998 and continuing during the course of his representation, respondent paid more than $6,000 to Mr. Johnson. Mr. Johnson testified that the $6,000 was not for expenses related to the case or investigation and was to be used in any way he chose. Respondent testified that the money was advanced for living expenses.

{¶ 14} Based on these facts, the panel found by clear and convincing evidence that respondent had advanced money to Mr. Johnson in violation of DR 5-103(B) (a lawyer shall not advance or guarantee financial assistance to his client). The panel dismissed the remaining alleged violation under Count 4.

{¶ 15} Count 5 concerns respondent's failure to return files to Scott Johnson. Mr. Johnson testified that during the course of respondent's representation, he had forwarded documents to respondent that Mr. Johnson had

obtained from Mitchell's attorney in the Minnesota juvenile case. On October 19, 1998, Mr. Johnson sent respondent a letter complaining of respondent's neglect of the case, respondent's attempts to sell publication rights, and respondent's desire to appear in the media. In his letter of October 23, 1998, terminating respondent, Mr. Johnson asked "that all records, including school records be returned to me with a written statement by you releasing me and my family from any past, current, or future financial responsibility." Respondent testified that he had sent Mr. Johnson "everything." However, respondent failed to produce a transmittal letter indicating that he returned the documents and also testified that he destroyed files for his juvenile clients. He added, "[A] lot of my files were taken by Mr. Tomeu, including a lot of the files that would contain what you're talking about." Mr. Johnson testified that he received no response.

{¶ 16} Based on this evidence, the panel found that Mr. Johnson was unable to identify which documents had not been returned by respondent and was unable to state how respondent's failure to return any of these unidentifiable documents prejudiced the legal matters in which his son was involved. Accordingly, the panel dismissed the alleged violations under Count 5.

{¶ 17} Count 10 concerns respondent's use of a misleading firm name. The panel found that from March 24, 1998 through November 1, 1998, respondent's letterhead indicated that his office was called "Tom Furth and Associates, Attorneys & Counselors at Law." However, no other attorneys were associated with respondent during this period. Respondent admitted that this was a violation of the Disciplinary Rules at the hearing. Accordingly, the panel concluded that respondent violated DR 2-102(B) (a lawyer in private practice shall not practice under a name that is misleading). The panel dismissed other alleged violations in Count 10.

{¶ 18} Count 11 concerns respondent's use of unverifiable, subjective, and self-laudatory language in public communication. The panel found that respondent

participated in or assisted in the creation of an Internet site relating to an Arkansas case involving Neal and Jesse Eldridge, two brothers accused of killing their father. The website contained information regarding respondent, including the following statements: "A passionate and aggressive advocate on behalf of his clients, Mr. Furth is well known for helping children and their families both within the legal system and outside of it" and "I tend to be tirelessly passionate on behalf of all of my young clients." Respondent testified that he was responsible for the content of the website concerning his qualifications.

{¶ 19} The panel also found that respondent had placed an advertisement in an edition of the Hudson Monthly that included the following statements: "Tom Furth * * * *Nationally noted. Amazingly affordable. Incredibly dedicated.* He's our neighbor and he's known from coast to coast. * * * Top notch legal services *with* a GUARANTEE of satisfaction and *24 hour a day access*." (Emphasis *sic*.) Respondent testified that he was responsible for the content of this advertisement. He further testified that he has vast experience of representing children in legal matters. The panel found that letters and affidavits submitted on his behalf as well as testimony from witnesses confirmed his testimony.

{¶ 20} Based on these facts, the panel concluded that the information contained on the website did not rise to the level of a Disciplinary Rule violation. Accordingly, the panel dismissed all the alleged violations in Count 11.

{¶ 21} Count 7 concerns the mishandling of a personal injury settlement of Angela Catania. On or about April 25, 1998, Angela Catania was involved in a car accident in Solon, Ohio. Catania received medical treatment as a result of physical injuries that she sustained in the accident. During the course of his representation of Catania, respondent sent Westfield Insurance Company (the tortfeasor's insurer) a draft affidavit from Catania indicating that Dr. John P. Wilson, a psychologist and expert in posttraumatic stress disorder, would be treating her. Respondent testified that Catania had helped draft the affidavit. However, Catania testified that she

never saw Dr. Wilson and that she did not believe that she was in need of any mental health treatment as a result of her accident. She also testified that she was not consulted by respondent regarding the affidavit and that it was inaccurate in several respects.

{¶ 22} In addition to the affidavit, respondent sent Westfield Insurance a letter stating, "It is my sincere hope that you will take into account the fact that her injuries are real, that she continues to suffer quite a bit, and that her psychological state is indicative of her need for a great deal of such care." Sometime thereafter, respondent reached a settlement with Westfield Insurance in the amount of $14,750 for Catania's claim. As respondent was being pursued by creditors, he asked his brother, Doug Furth, to deposit the settlement check in his own account at the stock brokerage firm of Merrill Lynch. Doug Furth deposited the check, and, according to respondent's instructions, kept a separate accounting of the money and disbursed portions of it to Catania.

{¶ 23} The panel also found that respondent later provided Catania with a disbursement schedule detailing that Dr. Wilson had been paid $1,500. However, Dr. Wilson had never even met with Catania, had not billed for any matters related to her accident, and had never received any payment from respondent related to those matters. Finally, respondent also withheld $731.55 for additional bills and fixed costs, stating, "Any unused portion of this remaining balance [will] be paid to Angela in 30 days after all final reports from doctors, etc."

{¶ 24} Respondent admitted that he provided no additional accounting regarding the $731.55 and that he had made no payment to Dr. Wilson. At the hearing, over a year after respondent provided Catania with the disbursement schedule, respondent was still in possession of the monies and only then agreed to return both the $731.55 and $1,500 sums to Catania.

{¶ 25} Based on this evidence as to Count 7, the panel concluded that because the money was commingled with other funds belonging to respondent,

there was a violation of DR 9-102(A) (all funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited into one or more identifiable bank accounts and no funds belonging to the lawyer or law firm shall be deposited therein). The panel concluded that, although respondent's accounting was sloppy, it did not rise to a violation of DR 1-102(A)(4). Additionally, the panel concluded that there was no clear and convincing evidence of the remaining violations alleged under this count.

{¶ 26} Count 8 concerns respondent's presentation of forged documents in his own personal injury suit and in matters relating to three individuals: Joseph Leonetti, Linda Wander, and Jason Widing. The panel found that on or about January 23, 1994, respondent was robbed at gunpoint at a hotel in Florida. As a result of the robbery, respondent pursued a personal injury claim against the hotel. Florida attorney Peter W. Martin represented him in the matter.

{¶ 27} On or about March 23, 1998, respondent faxed a letter to Martin. The letter was purported to have been written and signed by Kim Goldhamer, a friend of respondent who was also an independent social worker licensed to practice in Ohio. The letter, which claimed that respondent had undergone one hundred fifty counseling sessions over a two-year period with Goldhamer, was sent by Martin to the hotel as support for respondent's claims of damages. However, Goldhamer testified that she had never provided counseling to respondent, had neither written nor signed the letter, and had never authorized anyone else to write or sign the letter. Respondent testified that he had faxed the letter to his attorney in Florida but had not read it; he insisted, however, that Goldhamer had provided him with extensive counseling. Respondent subsequently settled with the hotel in question for $75,000.

{¶ 28} The second matter in Count 8 concerns Joseph Leonetti, a former business associate of respondent. The panel found that during the course of Leonetti's divorce, an issue arose concerning Leonetti's alleged ownership of

8

securities in an account in respondent's name. As a result, the Geauga County Court of Common Pleas issued an order freezing respondent's account. On or about March 23, 1998, respondent filed a motion with the court requesting that the court vacate its order. Testimony at the hearing established that respondent prepared the motion to vacate, proofread it, signed it, and was responsible for its filing.

{¶ 29} Respondent supported the motion with an affidavit that was purportedly signed by Goldhamer, whose signature respondent had notarized. However, once again, Goldhamer testified that she had neither written nor signed the letter and did not authorize anyone else to write or sign the letter. Moreover, she testified that the basic premise of the affidavit was false, *i.e.,* that she and respondent shared business interests and plans. Respondent admitted that he had not witnessed Goldhamer sign the affidavit.

{¶ 30} The third matter in Count 8 concerns respondent's client, Linda Wander, who was charged with driving under the influence of alcohol in 1997. Respondent appeared as attorney of record for Wander in Portage County Municipal Court. Respondent submitted a letter to the court, purportedly written and signed by Goldhamer, which stated that Wander had attended a seventy-two-hour alcohol course with Goldhamer. Once again, Goldhamer testified that she had never written or signed the letter and had not authorized anyone else to write or sign it. In addition, she testified that respondent had contacted her requesting such a letter but that she had refused because she had not provided the course to Wander; respondent was "extremely upset" when she refused.

{¶ 31} Although respondent testified that he had not submitted the letter to the court, Agreed Stipulation 16 states, "On or about April 13, 1998, respondent appeared in court on behalf of Ms. Wander and presented Stipulated Exhibit 5." Respondent further testified that he had not prepared it.

{¶ 32} The fourth and final matter in Count 8 concerns respondent's client, Jason Widing. The panel found that respondent represented Widing on a personal

injury claim resulting from a motor vehicle accident and that he submitted two letters to an insurance company on Widing's behalf during negotiations. The letters were purportedly written by Goldhamer and referred to psychological damage caused Widing as a result of the accident.

**{¶ 33}** Goldhamer testified that she learned of the reports only when Widing's new attorney contacted her and requested that they be updated. She further testified that she had never prepared or signed the documents and that they were forgeries.

**{¶ 34}** Relator presented all the forged documents purported to have been written by Goldhamer to a handwriting expert who examined handwriting samples from respondent, Leo Tomeu, and Goldhamer. Although the expert eliminated Goldhamer and respondent as the signers of the documents, the expert could not rule out Leo Tomeu.

**{¶ 35}** Based on these facts, as to Count 8, the panel concluded, "It strains credibility for the Respondent to contend that he did not read a letter that dealt with him and was going to be used in his own personal injury case." Accordingly, the panel found violations of DR 7-102(A)(5) (knowingly making a false statement of law or fact) and 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). However, the panel concluded that the evidence was not clear and convincing that respondent knew that the other letters, affidavits, and reports were forged and dismissed the remaining allegations. Finally, the panel concluded that respondent had not witnessed the signature of Kim Goldhamer for her affidavit, as a notary is sworn to do.

**{¶ 36}** Count 3 concerns respondent's interest in publication rights regarding the Jonesboro tragedy. Count 6 involves respondent's failure of cooperation with the disciplinary investigation. The panel dismissed Counts 3 and Count 9 concerns the allegation that respondent aided the unauthorized practice of

law. As relator presented no evidence on this count, the panel dismissed it, and relator has withdrawn it.

{¶ 37} In mitigation, the panel found that respondent admitted that he had violated DR 2-102(B) (a lawyer in private practice shall not practice under a name that is misleading) and 2-105(A) (a lawyer shall not hold himself out publicly as a specialist or as limiting his practice). The panel also found that respondent admitted to not properly supervising his paralegal employee, Leo Tomeu. The panel asserted that Tomeu was involved with every grievance filed against respondent. Respondent also admitted that he lacked the proper resources to undertake the defense of Mitchell Johnson. The panel found that although respondent should avoid representing clients in matters for which he does not have adequate resources, he has a sincere interest in working with juveniles, and "[w]hile not necessarily a trial advocate, it is clear that Respondent is an advocate for doing the right thing for the juveniles he has been hired to help."

{¶ 38} The board adopted the findings of fact and conclusions of law of the panel and recommended that respondent be suspended from the practice of law for a period of two years. The board also recommended that the Supreme Court notify the Governor's Notary Commission of respondent's violation of the statute governing notaries public.

{¶ 39} Relator has objected to the board's recommendation and raises the following six legal arguments:

(1) Respondent's conduct as outlined in Count 1 violates Disciplinary Rules in addition to the violations identified by the board.

(2) Respondent assumed responsibility for a number of legal matters for Scott and Mitchell Johnson and neglected them all, thereby violating the Code of Professional Responsibility.

(3) Respondent's misconduct includes his failure to return documents to his client after the attorney-client relationship ended.

(4) Respondent's conduct as detailed in Count 7 violates additional Disciplinary Rules.

(5) Respondent's conduct as detailed in Count 8 violates additional Disciplinary Rules.

(6) Respondent used unverifiable, subjective, and self-laudatory language in his website and his advertising.

{¶ 40} The Supreme Court is not bound by the conclusion of either the panel or the board regarding the facts or law when determining the propriety of an attorney's conduct and the appropriate sanction. *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 330, 708 N.E.2d 193, 197. Therefore, in making our determination, we have considered not only the board's findings of fact and conclusions of law, but the record, testimony, the exhibits, the pleadings, the stipulations, and the legal arguments presented to the court.

{¶ 41} In disciplinary proceedings, the relator bears the burden of proving by clear and convincing evidence the facts necessary to establish a violation. *Id.* at 331, 708 N.E.2d at 197, citing Gov.Bar R. V(6)(J) and *Disciplinary Counsel v. Jackson* (1998), 81 Ohio St.3d 308, 310, 691 N.E.2d 262, 263. " 'Clear and convincing evidence' [is] 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Ohio State Bar Assn. v. Reid*, 85 Ohio St.3d at 331, 708 N.E.2d at 197, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus. Upon review, we find that relator met its burden of proof on all of the counts as recommended by the board. We conclude that relator has met its burden on several other alleged violations that the panel and the board inappropriately dismissed.

Count 1

**{¶ 42}** Relator argues that in addition to the violations identified by the board, respondent violated DR 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(6) (engaging in conduct adversely reflecting on his fitness to practice law), 2-104(A) (a lawyer who has given unsolicited advice to a layman that he should obtain counsel or take legal action shall not accept employment resulting from that advice), and 7-102(A)(5) (knowingly making a false statement of law or fact). We agree.

**{¶ 43}** The panel found that testimony at the hearing indicated that respondent concentrated his practice in representation of juveniles. However, of the forty-two juveniles with whom respondent claimed to have had some involvement, relator was able to verify only seven cases from the Cleveland area. Furthermore, respondent provided no evidence to justify his claim of a national reputation. Therefore, although respondent may have concentrated on juveniles in his law practice, we hold that relator proved unverifiable by clear and convincing evidence respondent's assertions that "[y]ou will not find anyone in the United States that is more of an expert in this regard than I am" and that he has developed a national reputation for representing juveniles. Accordingly, we hold that respondent violated DR 1-102(A)(4).

**{¶ 44}** Lying to a court is unacceptable and will not be tolerated. " 'An attorney owes his first duty to the court. He assumed his obligations toward it before he ever had a client.' " *Cincinnati Bar Assn. v. Nienaber* (1997), 80 Ohio St.3d 534, 537, 687 N.E.2d 678, 681, quoting *In re Integration of Nebraska State Bar Assn.* (1937), 133 Neb. 283, 289, 275 N.W. 265, 268. Evidence proves that respondent knowingly made a false statement of fact when he told the Chancery Court of Craighead County, Arkansas, that he had become involved with Scott Johnson by sending him a condolence note. As respondent testified before the panel, respondent sent a solicitation letter to the public defenders assigned to represent Mitchell Johnson, attempted to contact the public defenders, and signed

and faxed a solicitation letter to Scott Johnson, all before he supposedly sent a condolence note. Neither the panel nor the board stated a reason for dismissing clear evidence of a violation of respondent's duty to be honest when communicating with a client. Accordingly, we conclude that relator proved by clear and convincing evidence that respondent violated DR 7-102(A)(5).

{¶ 45} The panel found that respondent was responsible for the actions of his employee in the original solicitation. However, the panel inexplicably dismissed the alleged violation of DR 2-104(A). Respondent's six-page solicitation letter to Mr. Johnson is replete with unsolicited advice detailing Mitchell Johnson's need for a comprehensive plan, including legal, psychological, and public relations actions that respondent felt were in Mitchell's best interests. Accordingly, we hold that relator proved by clear and convincing evidence that respondent violated DR 2-104(A).

{¶ 46} Finally, respondent's conduct in soliciting Scott Johnson, falsely holding himself out as a specialist to both Scott Johnson and the public defenders, offering unsolicited advice, and misrepresenting facts to a court establish that respondent engaged in conduct adversely reflecting on his fitness to practice law. Accordingly, we hold that respondent violated DR 1-102(A)(6).

Count 2

{¶ 47} The board found no violations under Count 2, based on its conclusion that the evidence was not clear and convincing that respondent ever agreed to represent Scott Johnson concerning any legal matters other than the criminal charge. Relator argues that respondent violated DR 6-101(A)(3) (neglecting a legal matter entrusted to him), 7-101(A)(1) (failing to seek the lawful objectives of his client), 7-101(A)(2) (failing to carry out a contract of employment), and 1-102(A)(6) (engaging in conduct that adversely reflects on his fitness to practice law). We agree.

**{¶ 48}** Respondent's documents to Mr. Johnson show that he agreed to represent Mitchell in his Minnesota case as well as in several civil lawsuits relating to the Arkansas shooting. The May 28, 1998 memorandum even gave filing deadlines for two of the proposed lawsuits: one of the federal lawsuits was to be filed on June 3, 1998, and the Minnesota lawsuit on June 4, 1998. Respondent participated in a telephone conference in a Minnesota case as Mitchell's attorney and was ordered to draft a plea agreement with the prosecutors. Respondent concedes that he "agreed to represent Mitchell Johnson in a Juvenile case pending in Minnesota for the sole purpose of finalizing a Judgment Entry." Indicative of respondent's neglect, respondent never obtained a signature on the document and never sent it back to the Minnesota court. Third, respondent's own press release identified him as "attorney for the Johnson family, for Mitchell Johnson relative to Minnesota criminal charges, and Arkansas civil charges, and member of the Arkansas criminal defense team."

**{¶ 49}** Finally, Mr. Johnson's letter of October 19, 1998, specifically complained about respondent's neglect of Mitchell's Minnesota case, a civil suit brought by families of the victims, Scott Johnson's child support obligation case, and a federal lawsuit relating to treatment Mr. Johnson received by Arkansas authorities. In his termination letter to respondent, Mr. Johnson stated, "I have asked you repeatedly about the Federal case filings, civil answers, etc., and you always answer that there is no hurry, or that you're almost finished with the paper work."

**{¶ 50}** Again, we disagree with the board's conclusion that these facts do not clearly and convincingly prove that Mr. Johnson reasonably believed that respondent was representing him and his son on all of the matters to which respondent referred in his own communication. Accordingly, we hold that relator proved by clear and convincing evidence that respondent violated DR 6-101(A)(3), 7-101(A)(1), 7-101(A)(2), and 1-102(A)(6).

### Count 5

**{¶ 51}** The board found no violation, based on its conclusion that relator failed to prove by clear and convincing evidence that respondent did not return all of the documents to Mr. Johnson.

**{¶ 52}** Relator argues that respondent violated DR 2-110(A)(2) (failing to deliver to the client all papers and property to which the client is entitled), 1-102(A)(5) (engaging in conduct that is prejudicial to the administration of justice), 1-102(A)(6) (engaging in conduct that adversely reflects on his fitness to practice law). We agree.

**{¶ 53}** Mr. Johnson expressly requested that respondent return all records in his possession, including school records, in his letter of October 23, 1998. In his testimony, Mr. Johnson denied receiving any documents from respondent. Respondent's testimony regarding this point was inconsistent: he initially testified that he had returned Mr. Johnson's documents but in later testimony stated that Tomeu had taken many of his files, including those of Mr. Johnson. Respondent also testified that he had a practice of destroying files for his juvenile clients. We find these facts prove by clear and convincing evidence that respondent did not return all of the documents to Mr. Johnson. Accordingly, we hold that respondent violated DR 2-110(A)(2), 1-102(A)(5), and 1-102(A)(6).

### Count 7

**{¶ 54}** We adopt the panel's findings of fact in Count 7. However, we decline to adopt the panel's conclusions of law and hold that there is clear and convincing evidence that respondent violated several additional Disciplinary Rules with respect to his representation of Angela Catania. Respondent intentionally misled the insurance company during negotiations by falsely asserting that Catania suffered psychological injuries. Respondent prepared a false settlement document by listing a nonexistent medical bill of $1,500 and withheld, without justification, an additional $731.55. Finally, respondent gave the settlement proceeds to his

brother, Doug Furth, to be deposited in his brother's personal checking account. Accordingly, we hold that respondent violated DR 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(6) (engaging in any other conduct adversely reflecting on a lawyer's fitness to practice law), 9-102(B)(4) (a lawyer shall promptly pay or deliver to the client as requested by the client funds in the possession of the lawyer which the client is entitled to receive), and 9-102(B)(3) (a lawyer shall maintain complete records of all funds of the client coming into the possession of the lawyer and render appropriate accounts to his client regarding the same). Were we to adopt the recommendations of the panel and the board on these facts, we would thereby send a message to the bar that could not be rationalized with our professional standards.

Count 8

{¶ 55} Although the panel found that respondent violated Disciplinary Rules regarding his own personal injury case, it concluded that the evidence was not clear and convincing that respondent knew that the letters, affidavits, and reports in the matters concerning Joseph Leonetti, Linda Wander, and Jason Widing were false. We disagree. It is illogical to conclude that respondent intentionally wrote and used a false affidavit with a forged signature in his own personal injury case, yet conclude that the other false affidavits, letters, and reports purportedly prepared by the same person do not constitute clear and convincing evidence that respondent used falsified documents. Moreover, if the panel believed Goldhamer's testimony that she did not write or sign the affidavit in respondent's personal injury case, it follows that her testimony regarding the other cases would also be credible. The panel offers no reason to make a distinction. Accordingly, we hold that respondent violated DR 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(5) (engaging in conduct that is prejudicial to the administration of justice), 1-102(A)(6) (conduct adversely

reflecting on his fitness to practice law), 7-102(A)(4) (knowingly using false evidence), and 7-102(A)(5) (knowingly making a false statement of law or fact).

## Count 10

**{¶ 56}** Respondent admitted that he violated DR 2-102(B) (a lawyer in private practice shall not practice under a name that is misleading), and the board found a violation. We agree.

## Count 11

**{¶ 57}** The board found no violation, concluding that information contained within the website did not rise to a level of the Disciplinary Rule violation. We conclude otherwise. In *Medina Cty. Bar Assn. v. Grieselhuber* (1997), 78 Ohio St.3d 373, 678 N.E.2d 535, we held that inclusion of the statement "We Do It Well" in an advertisement was unverifiable and a violation of DR 2-101(A)(4) (a lawyer shall not use any form of public communication that is not verifiable).

**{¶ 58}** Similarly, in *Disciplinary Counsel v. Bradley* (1998), 82 Ohio St.3d 261, 695 N.E.2d 248, an attorney mailed to the general public brochures that described the attorney as a "leader in the creation of quality living trust documents" and published the brochure in a newspaper. We held this conduct to be a violation of DR 2-101(A)(1) (a lawyer shall not use any form of public communication that contains any false, fraudulent, misleading, deceptive, self-laudatory, or unfair statement).

**{¶ 59}** Under the standard of *Bradley* and *Grieselhuber*, respondent's statements in the website and his advertisement are clearly unverifiable and self-laudatory. Accordingly, we find that respondent violated DR 2-101(A)(4) and 2-101(A)(1).

## Sanction

**{¶ 60}** In recommending a two-year suspension, the board found that respondent engaged in the following instances of misconduct:

- Holding himself out as a specialist,

- Soliciting Scott Johnson,

- Making misrepresentations of fact to an Arkansas court,

- Paying his client, Scott Johnson, more than $6,000,

- Failing to deposit Catania's settlement funds in a trust account,

- Knowingly using a forged letter in his own personal injury case, and

- Using a misleading firm name.

{¶ 61} Concluding that respondent's misconduct occurred during a nine-month period beginning with solicitation of Scott Johnson, the board recommended that respondent be suspended for a period of two years. However, the forged letter that respondent used in his own personal injury case was dated March 4, 1998, weeks before the Arkansas shooting. And his misconduct with regard to Catania all occurred after he was terminated by Scott Johnson. We agree with relator that the record compels a reevaluation of the sanction recommended by the board based upon the following conduct:

- Making misrepresentations in his solicitation letters to the Arkansas public defenders and to Scott Johnson,

- Advising a nonlawyer that he should obtain counsel and accepting employment resulting from that advice,

- Lying to a court,

- Neglecting legal matters,

- Using false affidavits to vacate a court order and to obtain money settlements in his own and in others' personal injury cases,

- Withholding settlement monies from a client, and

- Using unverifiable and self-laudatory statements in advertisements.

{¶ 62} In only a few disciplinary cases has a lawyer violated so many rules of conduct as respondent has violated here. His myriad violations of express rules are not isolated incidents but form a distinct pattern of disregard for the courts,

clients, other professionals, and for his own integrity. Because respondent has demonstrated blatant disregard for the most important standards by which members of the bar of Ohio are expected to conduct their professional activities, respondent is hereby permanently disbarred from the practice of law in Ohio. Costs are taxed to respondent.

*Judgment accordingly*.

PETREE, RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., dissents and would indefinitely suspend respondent.

CHARLES R. PETREE, J., of the Tenth Appellate District, sitting for DOUGLAS, J.

_____

*Jonathan E. Coughlan*, Disciplinary Counsel, for relator.

*Crabbe, Brown & James*, *Larry H. James* and *Christina L. Corl*, for respondent.

_____