[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Harter,* Slip Opinion No. 2018-Ohio-3899.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-3899

DISCIPLINARY COUNSEL *v.* HARTER.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Harter,* Slip Opinion No. 2018-Ohio-3899.]

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including misappropriating client funds, knowingly making false statements of material fact in connection with a disciplinary matter, and engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation— Permanent disbarment.*

(No. 2018-0249—Submitted April 10, 2018—Decided September 27, 2018.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2017-021.

_____

**Per Curiam.**

{¶ 1} Respondent, Brian Wade Harter, of Delaware, Ohio, Attorney Registration No. 0055500, was admitted to the practice of law in Ohio in 1991.  We

suspended his license to practice law for five days in December 2013 because he had defaulted on a child-support order. *See In re Harter*, 137 Ohio St.3d 1258, 2013-Ohio-5355, 2 N.E.3d 263; and *In re Harter*, 137 Ohio St.3d 1260, 2013-Ohio-5486, 2 N.E.3d 265.

{¶ 2} In a five-count second amended complaint filed on November 13, 2017, relator, disciplinary counsel, charged Harter with 28 violations of the Professional Conduct Rules arising from his misappropriation of client funds, unauthorized disclosure of confidential client information, and failure to reasonably communicate with clients, as well as his dishonesty and failure to respond to demands for information throughout relator's investigation. The parties entered into stipulations of fact and some misconduct. After a hearing, a three-member panel of the Board of Professional Conduct found that Harter had committed all but two of the alleged rule violations. In light of Harter's substantial misconduct—including his false testimony throughout the disciplinary process—the panel recommended that he be permanently disbarred from the practice of law in Ohio. The board adopted the panel's report and recommendation in its entirety, and no objections have been filed.

{¶ 3} We adopt the board's findings of fact and misconduct and agree that permanent disbarment is the appropriate sanction in this case.

**Misconduct**

*Count One—Williams*

{¶ 4} Jesse Williams retained Harter to pursue a workers' compensation claim. In November 2014, Harter went to the Ohio Bureau of Workers' Compensation ("BWC") to pick up a $5,632.08 settlement check issued to Williams in care of Harter. Although Harter had not informed Williams of the check or obtained his authorization to negotiate it, he stipulated that he signed his own name to the back of the instrument and had it cashed by another of his clients, Yachine "Steve" Arsalane, who owned a convenience store.

{¶ 5} The next month, Williams checked the status of his BWC claim online and discovered that a check had been issued. When Williams inquired about the money, Harter provided multiple excuses for why he had not given Williams the money, all of which were lies. For example, at various times, he told Williams that the check had not been processed right away, that the check was with a secretary, and that his ex-wife had stolen the money. Eventually, Williams contacted the law firm of Mitchell & Pencheff—where Harter maintained office space—and the firm issued him a check for $4,000 to cover his claim and losses.[1] Harter later reimbursed the firm.

{¶ 6} After Williams filed a grievance against Harter, Harter went to Williams's place of business and persuaded him—albeit temporarily—to withdraw the grievance. Harter never responded to relator's initial July 6, 2015 letter of inquiry regarding the grievance, even after receiving extensions and twice promising to submit his response within a day or two. Even after relator hand-delivered a second letter of inquiry and a subpoena, Harter did not submit a response.

{¶ 7} At Harter's initial deposition with relator in September 2015, he repeatedly denied having misappropriated or stolen Williams's funds and claimed that he had impulsively decided to have Steve cash the check—even though BWC records show that he had cashed five previous checks through Steve. He also claimed that he had cashed the check in that manner in order to get the money to Williams quickly when, in fact, he had misappropriated the funds. During a second deposition in June 2016, Harter admitted that he had lied at his first deposition. At the panel hearing, however, he denied that his initial deposition testimony had been false. Ultimately, Harter admitted that he had misappropriated Williams's funds in order to pay his child support and other personal expenses.

---

[1] Although Harter had intended to establish an of counsel relationship with the firm, that relationship never came to fruition.

{¶ 8} The parties stipulated and the board agreed that by cashing the check through Steve without Williams's consent, Harter violated Prof.Cond.R. 1.4(a)(1) (requiring a lawyer to inform the client of any decision or circumstance with respect to which the client's informed consent is required); 1.4(a)(3) (requiring a lawyer to keep the client reasonably informed about the status of a matter);[2] 1.6(a) (prohibiting a lawyer from revealing confidential client information without informed consent); and 1.15(a) (requiring a lawyer to hold the property of clients in an interest-bearing client trust account, separate from the lawyer's own property).

{¶ 9} In addition, the board found that Harter's conduct violated Prof.Cond.R. 1.15(a)(2) (requiring a lawyer to maintain a record for each client that sets forth the name of the client; the date, amount, and source of all funds received on behalf of the client; and the current balance for each client); and that by his false statements and omissions in his deposition and hearing testimony, failure to timely respond to multiple letters of inquiry, and misappropriation of Williams's funds, he violated Prof.Cond.R. 8.1(a) (prohibiting a lawyer from knowingly making a false statement of material fact in connection with a disciplinary matter); 8.1(b) (prohibiting a lawyer from failing to disclose a material fact or knowingly failing to respond to a demand for information by a disciplinary authority during an investigation); and 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

*Count Two—Davis*

{¶ 10} In February 2014, Clarence Davis retained Harter to represent him in workers' compensation and employment claims. He paid a $100 retainer and agreed to a one-third contingent fee. In November 2014, BWC issued a check of

---

[2] Relator's complaint charged Harter with a violation of Prof.Cond.R. 1.4(a)(2), and described the rule as requiring a lawyer to keep the client reasonably informed about the status of a matter. Because it is actually Prof.Cond.R. 1.4(a)(3) that requires a lawyer to keep the client reasonably informed about the status of the client's legal matter, we find that Harter's conduct violated that rule.

$4,251 payable to Davis in care of Harter. In a June 2016 deposition, Harter claimed that he met Davis at a local Bob Evans restaurant after receiving the check and that when Davis pleaded with him to get the check cashed immediately, Harter went directly to Steve, and returned to Bob Evans a short time later and gave Davis the cash. However, before the board, Harter stipulated that after getting the check from BWC, he called Davis, who was out of town, and offered to cash the check through a friend and pay Davis when he returned to town. At Harter's board hearing, Davis testified that he was out of town when Harter contacted him about obtaining the check from BWC, and that Harter offered to deposit the check into the law firm's client trust account. Ultimately, Harter admitted that he had cashed Davis's check through Steve's convenience store without Davis's consent. He later gave Davis $2,500, and claimed that he kept $334.56 to pay a potential medical bill. Harter gave Davis $300 the following month, but never remitted the remaining $34.56 or provided Davis a closing statement. Harter did not take significant further action regarding Davis's BWC or employment claims. Nor did he return numerous telephone calls from Davis, who explained that his doctor refused to provide additional treatment until his bill was paid. Davis eventually retained new counsel who persuaded his doctor to resume treatment.

{¶ 11} The parties stipulated and the board agreed that Harter violated Prof.Cond.R. 1.15(a) by failing to deposit Davis's funds into a client-trust account separate from his own funds. In addition, the board found that because Harter failed to take significant further action on Davis's claims, return his calls, get his medical treatment reinstated, or provide a closing statement to Davis, Harter violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client); 1.4(a)(4) (requiring a lawyer to comply as soon as practicable with reasonable requests for information from the client); and 1.5(c)(2) (requiring a lawyer entitled to compensation under a contingent-fee agreement to prepare a closing statement to be signed by the lawyer and the client and provide a copy to

the client). Moreover, the board found that Harter had failed to maintain records to document the receipt and disbursement of Davis's funds, had revealed confidential information by having Steve cash the warrant, and had given false testimony when he testified at his disciplinary hearing that Davis had agreed to allow Steve to cash the check, in violation of Prof.Cond.R. 1.15(a)(2), 1.6(a), and 8.4(c). The panel unanimously dismissed one other alleged violation.

*Count Three—Ali*

{¶ 12} In June 2015, Mohamed Ali retained Harter to file a complaint for divorce in Franklin County. Ali paid a retainer, a $500 advance for expenses, and some additional money, but Harter did not have a client-trust account in which to deposit those funds.[3] According to a "Client Funds Ledger" prepared by Harter, the $500 advance was deposited to a prepaid-debit-card account at Fifth Third bank.

{¶ 13} Harter testified that he unsuccessfully attempted to electronically file Ali's complaint for divorce on August 18, 2015, at which time a $264 filing fee was deducted from the prepaid-debit-card account. He further testified that when he attempted to refile the complaint the following day, it was rejected for insufficient funds. According to Harter, his bank indicated that the initial $264 payment had been deducted and was not credited back to the account, and Harter had spent "a considerable amount of time" attempting to resolve the issue.

{¶ 14} The parties' stipulated exhibits, however, do not support Harter's testimony. A court receipt shows that there was a payment pending on August 19, 2015, at 02:16:56 p.m., but Harter provided no credible evidence to show that the second filing was rejected because his prepaid debit card was declined. The bank statement for the card shows an account balance of $0.00 on August 15, 2015, and a credit of $300 on August 19, 2015. And because the only debit from the account during the entire month of August was for $31.87 at a Meijer store, the board found

---

[3] The record before us does not establish the full amount of Ali's payments to Harter.

6

that the account held sufficient funds to cover the filing fee when Harter attempted to refile Ali's complaint. Therefore, the board rejected as false Harter's claim that he deposited $500 into the prepaid-debit-card account and his testimony that he twice submitted that card as payment for the $264 filing fee.

{¶ 15} The parties stipulated and the board found that Harter violated Prof.Cond.R. 1.15(a) by failing to hold Ali's funds in an interest-bearing client-trust account separate from his own property. The board also found that Harter misappropriated Ali's funds, failed to maintain required records regarding those funds, made false statements during relator's investigation, and gave false testimony at the disciplinary hearing in violation of Prof.Cond.R. 1.15(a)(2), 8.1(a), and 8.4(c). Harter admitted that he owes Ali $500 in restitution.

*Count Four—Byrdsong*

{¶ 16} On May 31, 2017, Bryant Byrdsong retained Harter to replace his court- appointed counsel in a criminal case pending in the Franklin County Court of Common Pleas. The case was scheduled for trial on June 5, 2017, but Harter had a conflict. Byrdsong's appointed counsel appeared on the trial date and informed the court that Byrdsong had retained Harter. The judge called Harter and directed him to enter a notice of appearance that day. After receiving several e-mails from the judge's bailiff, Harter finally entered his appearance on June 13, 2017.

{¶ 17} One of Byrdsong's court-appointed attorneys subsequently filed a grievance with relator after discovering that Harter had visited her client in jail on several occasions before the trial date without her knowledge or consent. In his response to relator, Harter acknowledged that he "could have better handled [his] initial involvement in [Byrdsong's] case," but he claimed that he had stopped by the judge's office before June 5th and informed the bailiff that he would be appearing on behalf of Byrdsong if the trial was continued. Harter also asserted that the bailiff had informed him that the trial would be continued for approximately

90 days. Harter reiterated these claims in his testimony before the board. However, the bailiff testified that she had not known Harter or had any conversation with him before June 5, 2017.

{¶ 18} On these facts, the board found that Harter had given false information and false testimony in violation of Prof.Cond.R. 8.1(a) and 8.4(c).

*Count Five—Hill*

{¶ 19} In 2012, Patricia Hill retained Harter to pursue a personal-injury claim. She signed a contingent-fee agreement and paid a $500 advance for expenses, which Harter did not deposit into a client trust account.

{¶ 20} Harter filed a personal-injury case in May 2014, with a $231.75 filing fee paid by Mitchell & Pencheff. Hill agreed to settle her claim for $6,500 in April 2015. At Harter's request, Hill authorized him to sign her name and her husband's name to the settlement agreement. Harter signed both names and then notarized both signatures, falsely indicating that the Hills had signed the agreement in his presence.

{¶ 21} Rather than deposit Hill's settlement check into a client trust account, Harter cashed the settlement check through Steve. Harter testified that he gave Hill $2,500 later that day. But Hill testified that Harter gave her just $2,100 and told her that he would hold the rest of her share to pay her medical bills and then release any remainder to her. The board found her testimony to be more credible than Harter's.

{¶ 22} When Hill's case settled, she had outstanding bills for medical treatment, including $3,020 to Dr. Charles May. Although Harter informed her that he would attempt to settle the debts, he had not paid any of those bills by the time the parties filed their stipulations on December 6, 2017. After deducting his one-third contingent fee and the $2,100 payment to Hill, approximately $2,400 remained to settle nearly $4,000 in medical bills and litigation expenses, including a $134.75 reimbursement to Mitchell & Pencheff for costs advanced by the firm.

{¶ 23} At Harter's third deposition, he testified that he had retained $2,030 in an envelope marked "P. Hill," in a safe at his mother's house. He stated that only his mother, and perhaps his sister or brother-in-law, knew the combination. Harter testified that he had $1,000 of Hill's money with him that he planned to give her following the deposition, but he refused relator's request to go to his mother's house to verify that the remaining $1,030 in funds were in the safe.

{¶ 24} Approximately one week after that deposition, Harter's mother permitted relator's investigator to inspect the safe. The investigator found a bag labeled "BancOhio" that contained $2,000, but there was no envelope marked "P. Hill." At the disciplinary hearing, Harter testified that the envelope was on his bed or dresser when the investigator inspected the safe. But the board did not find his testimony to be credible.

{¶ 25} One day before the disciplinary hearing, Harter paid Dr. May $1,500 and obtained a signed release of his claims against Hill. The board found that Harter owes restitution of $1,198.58 to Hill and $134.75 to Mitchell & Pencheff.

{¶ 26} The parties stipulated and the board found that Harter violated Prof.Cond.R. 1.15(a) and 1.15(a)(2) by failing to deposit Hill's $500 expense payment into a client trust account and failing to maintain any records regarding the receipt or distribution of those funds. The board also found that Harter violated Prof.Cond.R. 8.1(a), 8.4(c), and 8.1(b) by providing false deposition and hearing testimony, falsely notarizing his signing of the Hills' names to the settlement agreement, and failing to respond to relator's letter of inquiry regarding Patricia Hill's grievance. The panel unanimously dismissed a charge alleging a violation of Prof.Cond.R. 1.5(c)(2).

*Acceptance of the Board's Findings of Fact and Misconduct*

{¶ 27} Having independently reviewed the record in this case, we accept the board's findings of fact and misconduct with respect to each of these counts.

**Sanction**

**{¶ 28}** When imposing sanctions for attorney misconduct, we consider several relevant factors, including the ethical duties the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases. Because each disciplinary case is unique, however, we may take all relevant factors into account. *Columbus Bar Assn. v. Watson*, 144 Ohio St.3d 317, 2015-Ohio-4613, 42 N.E.3d 752, ¶ 7.

**{¶ 29}** The board found that each of the aggravating factors enumerated in Gov.Bar R. V(13)(B) are present in this case. Harter's license was previously suspended for nonpayment of child support. *See* Gov.Bar R. V(13)(B)(1). The record is replete with evidence of his dishonest and selfish motive. *See* Gov.Bar R. V(13)(B)(2). He lied repeatedly throughout his depositions and the hearing, and he admitted that he kept his clients' money "because [he] needed it," used it to cover his personal expenses, and failed to make full restitution to all of the affected clients. *Id*. He engaged in a pattern of misconduct that began in 2014 and continued through the date of his disciplinary hearing, and he has been found to have committed 26 rule violations. *See* Gov.Bar R. V(13)(B)(3), (4), and (9). He also failed to cooperate in the disciplinary process by not responding to multiple letters of inquiry and then giving false testimony. *See* Gov.Bar R. V(13)(B)(5) and (6).

**{¶ 30}** Although Harter admitted that some of his actions were wrong and ultimately admitted that he had misappropriated Williams's funds to pay his own personal expenses, he denied that he had committed theft. He claimed he had "just made a mistake" and stated, "I never intended to forever take this man's money, which is stealing." He continued to deny that he had done anything wrong in the Ali matter. And he steadfastly maintained that he had had a conversation with the judge's bailiff regarding Byrdsong's case—despite her testimony to the contrary. *See* Gov.Bar R. V(13)(B)(7). He also caused harm to vulnerable clients, including Davis, who went without medical treatment for many months while waiting for

Harter to get BWC to approve and pay for his treatment, and Hill, who had to borrow money to cover her filing fees and expenses and still has not received all of the money to which she is entitled. *See* Gov.Bar R. V(13)(B)(8).

{¶ 31} In contrast to the substantial aggravating factors present in this case, the board found that just one of the mitigating factors identified in Gov.Bar R. V(13)(C) is present—namely, a single letter from Harter's best friend, an assistant United States Attorney, who attests to his good character, *see* Gov.Bar R. V(13)(C)(5).

{¶ 32} The board acknowledged Harter's July 18, 2014 indictment in the Franklin County Court of Common Pleas on one count of trafficking in drugs and two counts of possession of drugs, all fifth-degree felonies, and the court's decision to grant intervention in lieu of conviction pursuant to R.C. 2951.041. But the board attributed no mitigating effect to Harter's professed opioid addiction, noting that although he offered some evidence that the disorder had been diagnosed by a qualified healthcare professional, he made no effort to link his addiction to the misconduct at issue in this case. *See* Gov.Bar R. V(13)(C)(7). Moreover, the board found that more than two years after the court granted intervention in lieu of conviction, Harter had not sought or obtained court-ordered psychological or opioid-specific treatment, though he claimed that he had stopped using drugs and that his drug screens had been negative since his guilty plea.

{¶ 33} The presumptive sanction for an attorney's misappropriation of client funds is disbarment, but that presumption may be tempered with sufficient evidence of mitigating or extenuating circumstances. *See*, *e.g.*, *Trumbull Cty. Bar Assn. v. Dull*, 151 Ohio St.3d 601, 2017-Ohio-8774, 91 N.E.3d 739, ¶ 11. In *Cleveland Metro. Bar Assn. v. Freeman*, 128 Ohio St.3d 421, 2011-Ohio-1483, 945 N.E.2d 1034, we found that Freeman had misappropriated client funds, engaged in multiple instances of neglect, failed to reasonably communicate with his clients, made false statements to his clients and relator's investigator, and failed to

cooperate in the disciplinary investigations. *Id.* at ¶ 22. Aggravating factors included Freeman's dishonest or selfish motive, pattern of misconduct, multiple offenses, failure to cooperate in the disciplinary process, failure to acknowledge the wrongful nature of his conduct, harm to vulnerable clients, and failure to make restitution. *Id.* at ¶ 23. The only mitigating factor was the absence of a prior disciplinary record. *Id.* Under those circumstances, we found that the only appropriate sanction was permanent disbarment.

**{¶ 34}** Here, Harter not only misappropriated client funds, but also revealed confidential information regarding multiple clients when he cashed their BWC checks through a client's convenience store, failed to cooperate in relator's investigation, and repeatedly made false statements of material fact while testifying under oath. And while the board found that all of the aggravating factors enumerated in Gov.Bar R. V(13) were present, Harter presented just one letter attesting to his good character. Based upon the foregoing, we agree that the only appropriate sanction for Harter's misconduct is permanent disbarment.

**{¶ 35}** Accordingly, Brian Wade Harter is permanently disbarred from the practice of law in Ohio and ordered to make restitution of $34.56 to Clarence Davis, $500 to Mohamed Ali, $1,198.58 to Patricia Hill, and $134.75 to Mitchell & Pencheff. Costs are taxed to Harter.

Judgment accordingly.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, FRENCH, FISCHER, DEWINE, and DEGENARO, JJ., concur.

_____

Scott J. Drexel, Disciplinary Counsel, and Donald M. Scheetz, Assistant Disciplinary Counsel, for relator.

Brian Wade Harter, pro se.

_____