**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Cincinnati Bar Assn. v. Eppley*, **Slip Opinion No. 2026-Ohio-160.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-160

CINCINNATI BAR ASSOCIATION *v.* EPPLEY.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cincinnati Bar Assn. v. Eppley*, Slip Opinion No. 2026-Ohio-160.]**

(No. 2025-0788—Submitted August 6, 2025—Decided January 22, 2026.)

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including neglect of client legal matters, misappropriation of client funds, unauthorized practice of law in another jurisdiction, and use of misleading firm name—Conditionally stayed two-year suspension.*

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-028.

——————————

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ. BRUNNER, J., did not participate.

**Per Curiam.**

{¶ 1} Respondent, Mark Carter Eppley, of Cincinnati, Ohio, Attorney Registration No. 0079218, was admitted to the practice of law in Ohio in 2005. He is also admitted to the practice of law in Kentucky and Pennsylvania.

{¶ 2} In a November 2024 complaint, relator, Cincinnati Bar Association, charged Eppley with 24 violations of the Ohio Rules of Professional Conduct arising from his representation of two separate clients and his false and misleading statements regarding his law firm and who worked for it. The parties submitted stipulations of fact and misconduct and aggravating and mitigating factors along with 21 joint exhibits.

{¶ 3} The matter proceeded to a hearing before a three-member panel of the Board of Professional Conduct. After the hearing, the panel unanimously dismissed one alleged rule violation. The panel later issued a report finding by clear and convincing evidence that Eppley committed the other 23 rule violations charged in the complaint. The panel recommended that he be suspended from the practice of law for one year with the entire suspension stayed on conditions intended to supervise and support his client-trust-account and law-office management. The board adopted the panel's report and recommendation. The parties have jointly waived objections.

{¶ 4} After a thorough review of the record, we adopt the board's findings of misconduct. However, we conclude that the appropriate sanction for Eppley's misconduct is a two-year law-license suspension with the entire suspension stayed on the conditions recommended by the board.

## MISCONDUCT

### Count I—The Thompson Matter

{¶ 5} In 2017, Ricky Thompson was convicted and sentenced in the United States District Court for the Middle District of Tennessee on multiple criminal charges. In August 2021, Thompson's fiancée, Trestina White, a resident of

Toledo, Ohio, contacted National Legal Professional Associates ("NLPA") to find an attorney to represent Thompson in postconviction proceedings, including submitting a motion for a new trial. NLPA contacted Eppley. According to the parties' stipulations, NLPA's website states that the organization has its main office in Cincinnati and "provides technical legal consulting assistance to licensed counsel." NLPA is not a lawyer referral service under Gov.Bar R. XVI. Eppley testified that he did not pay NLPA for referring Thompson's case to him.

{¶ 6} Although Eppley was not licensed to practice law in Tennessee or any of the federal courts in that State, he contacted Thompson at White's request and offered to represent him in his postconviction-relief proceedings in Tennessee. In September 2021, Thompson signed a fee agreement providing for a total fee of $15,000, with half of the amount allocated to the "investigation phase" and half to the "application phase." The agreement stated that the quoted fee included NLPA's fee for legal research, though Eppley testified that he did not make any payment to NLPA. White had previously paid an additional $3,000 directly to NLPA for a case evaluation and legal research.

{¶ 7} In October 2021, White signed an agreement in which she agreed to make an initial payment of $7,500 to Eppley, followed by monthly payments of $250 until the entire $15,000 fee was paid in full. By February 22, 2022, White had made 12 credit-card payments totaling $14,950. All credit-card payments to Eppley's firm—including the payments made by White—were deposited into Eppley's law-firm operating account. During the scope of relator's investigation, Eppley gave relator copies of his client-trust-account records from August 2021 through February 2023. But he did not produce any rule-compliant reconciliations of that account or client ledgers documenting the legal fees paid by White.

{¶ 8} By March 2022, though Eppley had filed no documents on Thompson's behalf, Eppley asked White for an additional $6,000 to draft a motion for Thompson's judicial release. White paid the additional fees in two separate

3

credit-card transactions on March 21. Both payments were deposited into Eppley's law firm operating account.

{¶ 9} Eppley did not perform any significant work on Thompson's motion for a new trial until the end of April 2022. Not until late October 2022 did Eppley first attempt to find Tennessee attorneys to sponsor his application for pro hac vice status; that effort was not successful. White reached out to Eppley on multiple occasions from August 2022 through January 2023 seeking an update on the motions being drafted on Thompson's behalf, but Eppley did not timely offer information.

{¶ 10} In March 2023, Eppley found a Tennessee attorney willing to assist him in filing for pro hac vice admission in Tennessee for a fee of $3,000 to $10,000. However, White informed Eppley that having already paid $21,000 to him and $3,000 to NLPA, she could not afford the additional cost.

{¶ 11} In August 2023—nearly two years after Eppley was retained to represent Thompson in the postconviction proceedings—White filed a grievance with relator. A few months later, White sent relator a letter stating that Eppley had contacted Thompson and was working on the case. At the end of the letter, White expressed her satisfaction with Eppley's plan to move forward in representing Thompson and asked relator to terminate its investigation. The parties have stipulated that Eppley drafted the letter at White's request. But White later contacted relator and stated that she wanted to continue pursuing the grievance to "keep the pressure on" Eppley so that he would continue to work the case.

{¶ 12} After White filed the grievance, Eppley sent Thompson a draft motion for a new trial and instructed Thompson to file the motion pro se. On September 25, 2023, Thompson filed the motion in the United States District Court for the Middle District of Tennessee. In February 2024, the government filed a pleading opposing Thompson's motion, arguing that the motion—filed six and a half years after Thompson's conviction—was time barred, that it did not rely on

newly discovered evidence, and that it attempted to relitigate issues already decided on appeal. At the time of Eppley's March 2025 disciplinary hearing, the federal district court had not ruled on Thompson's motion.

{¶ 13} In early 2024, White paid NLPA an additional $1,500 to prepare a motion to vacate, correct, or set aside Thompson's sentence along with a memorandum in support of that motion. As prepared by NLPA, the motion included a signature block with Eppley's address, email address, telephone number, and a space for his signature. Eppley removed his signature block and replaced it with one bearing Thompson's information before forwarding the document to Thompson.

{¶ 14} In July or August 2024, Eppley refunded the $21,000 that White had paid him to represent Thompson.

{¶ 15} The parties stipulated and the board found that Eppley's conduct in the Thompson matter violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client), 1.4(a)(3) (requiring a lawyer to keep a client reasonably informed about the status of a matter), 1.4(a)(4) (requiring a lawyer to comply as soon as practicable with a client's reasonable requests for information), 1.5(a) (prohibiting a lawyer from making an agreement for, charging, or collecting an illegal or clearly excessive fee), 1.15(a) (requiring a lawyer to hold the property of clients in an interest-bearing client trust account separate from the lawyer's own property), 1.15(a)(2) (requiring a lawyer to maintain a record for each client on whose behalf funds are held), 1.15(a)(3) (requiring a lawyer to maintain a record for the lawyer's client trust account, setting forth the name of the client, the date, the amount, the payor and payee for each credit and debit to the account and the amounts registered, and the account balance), 1.15(a)(5) (requiring a lawyer to perform and retain a monthly reconciliation of the funds held in the lawyer's client trust account), 1.15(c) (requiring a lawyer to deposit advance legal fees and expenses into a client trust account, to be withdrawn by the lawyer only as fees are

earned or expenses incurred), and 5.5(a) (prohibiting a lawyer from practicing law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction or assisting another in doing so). We adopt these findings of misconduct.

### Count II—The Arkenau Matter

{¶ 16} In August 2022, Diane Arkenau hired Eppley to pursue a claim for damages after her former partner allegedly devalued jointly owned real property in violation of a Kentucky court's orders. Eppley informed Arkenau that she had a strong case and that for a fee of $20,000, he could file a motion under Ky.Civ.R. 60.02 to recover her monetary damages. Eppley did not provide Arkenau with a written fee agreement or discuss an hourly fee. Arkenau understood that the $20,000 fee included everything needed to make her whole.

{¶ 17} By credit card, Arkenau paid Eppley $5,000, which was deposited into Eppley's firm operating account. Eppley instructed Arkenau to pay the remaining $15,000 by check payable to himself. Eppley deposited that check into his personal bank account.

{¶ 18} Eppley failed to respond to Arkenau's numerous phone calls from August to November 2022 requesting updates regarding the status of her case. When Eppley finally spoke to Arkenau, he promised that the motion would soon be complete, but he never filed anything on her behalf. On November 29, Arkenau terminated Eppley's representation and requested the return of her files. Eppley waited six weeks to respond to that request. And when he returned Arkenau's file to her in January 2023, he did not include a copy of the motion that he had prepared on her behalf, though he testified that he believes that he eventually gave her a copy. Although the invoice Eppley presented with Arkenau's file showed charges of $17,540, Eppley did not refund the remaining $2,460 of Arkenau's fee then. Around that time, Arkenau filed a grievance with Disciplinary Counsel, which was forwarded to relator for investigation.

{¶ 19} In July 2023, Eppley gave Arkenau a $2,460 check drafted on his client trust account—though he could not demonstrate that either of her payments had ever been deposited into that account. And during his disciplinary hearing, Eppley testified that he had refunded Arkenau's remaining fee in early September 2024. That sum would have been $17,540.

{¶ 20} The parties stipulated and the board found that Eppley's conduct violated Prof.Cond.R. 1.3, 1.4(a)(3), 1.4(a)(4), 1.5(a), 1.15(a), 1.15(a)(2), 1.15(a)(3), 1.15(a)(5), 1.15(c), 1.16(d) (requiring a lawyer to promptly deliver client papers and property as part of the termination of representation), and 1.16(e) (requiring a lawyer to promptly refund any unearned fee upon the lawyer's withdrawal from employment).[1] We adopt these findings of misconduct.

### Count III—Firm Name and Website

{¶ 21} The parties stipulated and the board found that Eppley is the sole attorney at his firm, which he has named "Eppley Legal Group." However, Eppley acknowledged that for more than one year after Philip Brandewie, a former associate, left his employment at Eppley Legal Group, the firm's website included a photo and information about Brandewie. And Eppley did not remove that information until after relator gave Eppley notice of its intent to file a formal disciplinary action against him.

{¶ 22} The parties stipulated and the board found that Eppley's firm name—i.e. "Eppley Legal Group"—and his failure to timely remove Brandewie's information from Eppley's website violated Prof.Cond.R. 7.1 (prohibiting a lawyer from making or using false, misleading, or nonverifiable communication about the lawyer or the lawyer's services), and 7.5(a) (prohibiting a lawyer from using a firm name, letterhead, or other professional designation that violates Prof.Cond.R. 7.1).

---

1. Relator's complaint, the parties' stipulations, and the panel and board reports identify the violation of Prof.Cond.R. 1.16(d) as a violation of Prof.Cond.R. 1.15(d). The description of the rule in each of those documents matches that of Prof.Cond.R. 1.16(d).

**{¶ 23}** Eppley's failure to remove Brandewie's information from Eppley's website following Brandewie's departure from Eppley's firm constituted a false, misleading, or nonverifiable communication about Brandewie and his services under Prof.Cond.R. 7.1. And in addition to prohibiting a lawyer from using a firm name, letterhead, or other professional designation that violates Rule 7.1, Prof.Cond.R. 7.5 more specifically provides, "A lawyer in private practice shall not practice under a name that is misleading as to the identity of the lawyer or lawyers practicing under the name . . . ."

**{¶ 24}** We have recognized that a firm name containing words that suggest multiple attorneys are employed by the firm is misleading when the named attorney is a sole practitioner who has no other attorneys associated with the practice. For example, we have found that an attorney who practiced under the firm name "Tom Furth and Associates, Attorneys & Counselors at Law" when no other attorneys were associated with him was misleading as to the identity of the lawyer or lawyers practicing under the firm name, in violation of former DR 2-102(B), the predecessor to Prof.Cond.R. 7.5, which also prohibited lawyers from practicing under a misleading name. *See Disciplinary Counsel v. Furth*, 2001-Ohio-1308, ¶ 17. We have also held that an attorney's use of "and Associates" in the name of her firm violated DR 2-102(B) when the "associates" were attorneys not affiliated with her office with whom she co-counseled on a regular basis. *Disciplinary Counsel v. Character*, 2011-Ohio-2902, ¶ 10-11.

**{¶ 25}** We agree with the board's determination that Eppley's continued use of the firm name "Eppley Legal Group" following Brandewie's departure from the firm constituted a misleading communication about Eppley or his services and was misleading as to the identity of the lawyer or lawyers practicing under the firm's name. *See* BCGD Op. No. 2006-2 (interpreting former DR 2-102(B): "[W]hen there is only one attorney in a law firm, the words "Group" or "Law Group" are not

8

proper in a law firm name.");[2] *see also In re McDonald*, 319 Ga. 197, 208 (2024) (holding that the use of the firm name "McDonald Law Group, L.L.C." by a solo practitioner constitutes a false communication about the lawyer's services and falsely implies through the firm name that she practices in a partnership or other organization). On these facts, we adopt the board's findings that Eppley's conduct violated both Prof.Cond.R. 7.1 and 7.5(a). And we note that to the extent that Eppley continues to use the firm name "Eppley Legal Group" when no other attorneys are employed by the firm, his violation is ongoing.

## RECOMMENDED SANCTION

{¶ 26} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 27} In this case, the parties have stipulated and the board has found that just one aggravating factor is present: Eppley committed multiple offenses. *See* Gov.Bar R. V(13)(B)(4). The parties stipulated to four relevant mitigating factors: Eppley has a clean disciplinary record, lacked a dishonest or selfish motive, made a good-faith effort to make restitution, and exhibited a cooperative attitude toward the disciplinary proceedings. *See* Gov.Bar R. V(13)(C)(1) through (4). In addition to those mitigating factors, the board noted that Eppley submitted four letters from attorneys who attested to his good character and reputation. *See* Gov.Bar R. V(13)(C)(5).

{¶ 28} Relator argued that the appropriate sanction for Eppley's misconduct is a one-year license suspension with the entire suspension stayed on the conditions that Eppley (1) commit no further misconduct, (2) serve a one-year period of monitored probation in accordance with Gov.Bar R. V(21), (3) meet with the

---

2. Effective January 1, 2015, the Board of Commissioners on Grievances and Discipline was renamed the Board of Professional Conduct. *See* Gov.Bar R. V(1)(A), 140 Ohio St.3d CII.

appointed monitoring attorney on a monthly basis for the entire term of the stayed suspension, (4) provide the monitoring attorney with complete access to his client trust account, including access to all monthly bank statements, journals, and client ledgers required to be maintained under Prof.Cond.R. 1.15, and (5) attend three hours of continuing legal education ("CLE") focused on law-office management and three additional hours focused on client-trust-account management. Eppley agrees with relator's proposed sanction.

{¶ 29} Citing Eppley's misappropriation of the fees paid by White and Arkenau, the board began its analysis with the presumption of disbarment as the sanction for misappropriation of client funds. *See Trumbull Cty. Bar Assn. v. Kafantaris*, 2009-Ohio-1389, ¶ 14, citing *Cleveland Bar Assn. v. Dixon*, 2002-Ohio-2490, ¶ 15. In addition, the board noted that in *Disciplinary Counsel v. Fowerbaugh*, 1995-Ohio-261, syllabus, we held, "When an attorney engages in [dishonesty, fraud, deceit, or misrepresentation], the attorney will be actually suspended from the practice of law for an appropriate period of time." The board recognized, however, that the sanctions of disbarment or an actual law-license suspension may be reduced with sufficient mitigating evidence. *See, e.g.*, *Disciplinary Counsel v. Harter*, 2018-Ohio-3899, ¶ 33 (recognizing that the presumptive sanction of disbarment for an attorney's misappropriation of client funds "may be tempered with sufficient evidence of mitigating or extenuating circumstances"); *Disciplinary Counsel v. Markijohn*, 2003-Ohio-4129, ¶ 8, citing *Dayton Bar Assn. v. Kinney*, 2000-Ohio-445, ¶ 4 (recognizing that an abundance of mitigating evidence can justify a sanction less than an actual suspension from the practice of law in cases involving dishonesty, fraud, deceit, or misrepresentation).

{¶ 30} After considering six cases in which we imposed conditionally stayed one- or two-year suspensions on attorneys who had engaged in misconduct similar to the misconduct at issue here, the board recommends that we impose a

one-year suspension with the entire suspension stayed on the conditions proposed by the parties.

{¶ 31} The first three cases considered by the board—*Cleveland Metro. Bar Assn. v. Watson*, 2022-Ohio-2212; *Cleveland Metro. Bar Assn. v. Gay*, 2018-Ohio-2170; and *Disciplinary Counsel v. Adelstein*, 2020-Ohio-3000—involved attorney misconduct that included acts of neglect, the failure to reasonably communicate with clients, and/or client-trust-account violations similar to Eppley's here.

{¶ 32} In *Watson*, the attorney neglected four client matters, failed to keep those clients reasonably informed about the status of their legal matters, and failed to reasonably communicate with them about the means by which their objectives were to be accomplished. Like Eppley, Watson failed to maintain client ledgers and failed to perform and maintain monthly reconciliations of his client trust account. He also failed to prepare a closing statement detailing the distribution of a client's settlement proceeds in a contingent-fee case and failed to promptly satisfy a medical lien on those proceeds. In addition to having the aggravating factor that is present in this case, Watson was found to have engaged in a pattern of misconduct.

{¶ 33} In *Gay*, the attorney failed to maintain required client-trust-account records as Eppley did in this case. But Gay also overdrew his client trust account, twice withdrew his fees from that account before depositing his clients' settlement proceeds, and lent $300 to a personal-injury client. The one aggravating factor was Gay's previous indefinite suspension, imposed more than 20 years earlier for misconduct that included misappropriation, accepting client fees without performing the contracted work, and failing to cooperate in the ensuing disciplinary investigation. Mitigating factors included the absence of a dishonest or selfish motive, Gay's cooperation in the disciplinary proceedings, and his efforts to educate himself and rectify his misconduct.

{¶ 34} In *Adelstein*, the attorney failed to deposit and hold client funds in a client trust account separate from her own property, failed to maintain client ledgers, and failed to perform and retain monthly reconciliations of her client trust account. She commingled personal and client funds in her client trust account and paid personal expenses from that account, overdrawing it on at least seven occasions and thereby engaged in conduct that adversely reflected on her fitness to practice law. Adelstein also failed to maintain disputed funds in a client trust account until the fee dispute was resolved. And she engaged in dishonest conduct by permitting a third-party payment service to reverse the client's withdrawal of his payment to her when her trust account had insufficient funds and instructing the payment service to deduct the amount from another client trust account unrelated to the fee dispute.

{¶ 35} In addition to having the single aggravating factor of multiple offenses that is present in this case, Adelstein had two attorney-registration suspensions and had acted with a dishonest and selfish motive. Mitigating factors included Adelstein's full and free disclosure to the board and cooperative attitude toward the disciplinary proceedings, the absence of harm to her client, and her efforts to rectify her client-trust-account issues during the pendency of the disciplinary proceedings. A majority of this court was convinced that most of Adelstein's violations were the result of her failure to fully understand her obligations under the Rules of Professional Conduct.

{¶ 36} In *Watson*, *Gay*, and *Adelstein*, we imposed one-year suspensions stayed in their entirety on conditions that, at a minimum, required the attorney to commit no further misconduct, serve a period of monitored probation, and complete at least six hours of CLE, in addition to the requirements of Gov.Bar R. X, focused on issues related to the attorney's misconduct. *See Watson*, 2022-Ohio-2212, at ¶ 21, *Gay*, 2018-Ohio-2170, at ¶ 15, and *Adelstein*, 2020-Ohio-3000, at ¶ 30.

{¶ 37} In this case, Eppley has also acknowledged that he provided some legal assistance to Thompson regarding Thompson's criminal conviction though he was neither licensed nor granted pro hac vice status in Tennessee or the in the United States District Court for the Middle District of Tennessee. Similarly, the fourth and fifth cases addressed by the board—*Disciplinary Counsel v. Maciak*, 2018-Ohio-544; and *Cincinnati Bar Assn. v. Gilbert*, 2014-Ohio-522—involved findings that the attorneys had violated Prof.Cond.R. 5.5 by practicing law in a jurisdiction in which they were neither licensed nor otherwise authorized to practice.

{¶ 38} In *Maciak*, the attorney engaged in the unauthorized practice of law for more than six years by serving as general counsel for a Florida corporation without obtaining the proper licensure or certification. Maciak also engaged in conduct that adversely reflected on his fitness to practice law by continuing to serve as corporate counsel in Florida for nearly four years while his Ohio law license was suspended for a CLE violation.

{¶ 39} The aggravating factor was Maciak's prior discipline, which consisted of attorney-registration and CLE suspensions. Mitigating factors included the lack of a dishonest or selfish motive, Maciak's cooperation in the disciplinary proceedings, favorable character and reputation evidence, and the absence of harm to any client. Citing the substantial evidence of Maciak's good character and remorse and the affirmative steps he took to prevent similar violations going forward, we suspended Maciak's law license for two years but stayed the entire suspension on the conditions that he engage in no further misconduct and comply with his CLE and attorney-registration obligations. *Maciak* at ¶ 32.

{¶ 40} In *Gilbert*, the attorney registered for inactive status in Ohio because he was also licensed in Kentucky and worked exclusively in that state for approximately ten years. He later accepted a job as an administrative assistant for a Cincinnati attorney, though he stipulated that in the few months he was there, he

performed some legal work for the attorney's clients before reactivating his Ohio license. In addition to engaging in conduct that violated Prof.Cond.R. 5.5(a), Gilbert failed to provide competent representation to three clients, neglected their legal matters, and failed to hold unearned fees belonging to two of the clients in a client trust account separate from his own property. The aggravating and mitigating factors present in *Gilbert* are the same ones present here, and like Eppley, Gilbert showed genuine remorse for his misconduct. We imposed a conditionally stayed one-year suspension for Gilbert's misconduct. *Gilbert,* 2014-Ohio-522, at ¶ 18.

{¶ 41} The final case discussed by the board—*Ashtabula Cty. Bar Assn. v. Brown*, 2017-Ohio-5698—involved misleading communications regarding the lawyer's services comparable to Eppley's violations of Prof.Cond.R. 7.1 and 7.5(a). Brown used the name of a then-sitting justice of this court on his office sign and business card approximately 18 years after they had last practiced law together. In addition to finding that Brown violated Prof.Cond.R. 7.1 and 7.5(a), as Eppley did in this case, we also found that Brown violated Prof.Cond.R. 7.5(c) (prohibiting the use of the name of a lawyer who holds a public office in a law firm's name during any substantial period in which the lawyer is not actively and regularly practicing with the firm). Brown engaged in multiple offenses like Eppley, but he also had a significant history of prior discipline, including an indefinite suspension and three attorney-registration suspensions, acted with a selfish motive, and failed to acknowledge the wrongful nature of his conduct. We imposed a conditionally stayed two-year license suspension for Brown's misconduct. *Brown* at ¶ 25.

{¶ 42} After weighing the facts of this case against those of *Watson*, *Gay*, *Adelstein*, *Maciak*, *Gilbert*, and *Brown*, the board found—and we agree—that an abundance of mitigating factors in this case justifies a departure from the general rules that might otherwise require actual time away from the practice of law. Eppley practiced law without incident for nearly 20 years before his current misconduct came to light. He did not act with a dishonest or selfish motive and

exhibited a cooperative attitude toward these disciplinary proceedings—stipulating to the facts and all but the one violation that was later dismissed by the panel. Eppley also made full restitution to White and Arkenau and submitted letters from four attorneys who attested to his good character and reputation. And in his testimony before the panel, Eppley accepted responsibility and expressed genuine remorse for his misconduct.

**{¶ 43}** The board recommends that we suspend Eppley from the practice of law for one year with the entire suspension stayed on the conditions that he (1) refrain from further misconduct, (2) complete a one-year term of monitored probation, (3) participate in monthly meetings with his monitoring attorney for the entirety of his stayed suspension, (4) provide the monitoring attorney with complete access to his client-trust-account and business-account records, including all records required to be maintained under Prof.Cond.R. 1.15, and (5) complete three hours of CLE focused on law-office management and three hours focused on client-trust-account management in addition to the requirements of Gov.Bar R. X.

**{¶ 44}** Having independently reviewed the record and our precedent, we conclude however that Eppley's misconduct is more concerning than the misconduct at issue in *Watson*, *Gay*, *Adelstein*, *Maciak*, *Gilbert*, and *Brown* because his misconduct is a combination of some of the most egregious misconduct that was at issue in each of those cases.

**{¶ 45}** Eppley neglected the legal matters of Thompson and Arkenau, charged them excessive fees, and failed to deposit and maintain their fees in his client trust account until they were earned. He effectively misappropriated nearly $35,000 from those clients. He failed to maintain required records regarding his client trust account and the fees he received from his clients, failed to take reasonable steps to protect Arkenau's interests when she terminated his representation, and failed to promptly refund even the undisputed portion of her fee for some time.

**{¶ 46}** Eppley failed to keep Thompson and Arkenau informed about the status of their legal matters and failed to comply as soon as practicable with their reasonable requests for information. He also represented and advised Thompson about his federal criminal conviction in Tennessee for more than two-and-a-half years without ever being licensed or otherwise authorized to practice law in that state. In addition, Eppley engaged in misleading communication about himself and his firm by using the firm name "Eppley Legal Group" and failing to remove attorney Brandewie's information from the firm website following Brandewie's departure.

**{¶ 47}** On these facts, we conclude that a two-year suspension stayed in its entirety on conditions is necessary to impart the seriousness of the misconduct, to protect the public, and to ensure that Eppley obtains the support and instruction necessary to conform his conduct to the requirements of the rules governing the practice of law in Ohio.

## CONCLUSION

**{¶ 48}** Accordingly, Mark Carter Eppley is hereby suspended from the practice of law in Ohio for two years with the suspension stayed in its entirety on the conditions that he (1) refrain from further misconduct, (2) serve a two-year term of monitored probation pursuant to Gov.Bar R. V(21), (3) participate in monthly meetings with his monitoring attorney for the entirety of his stayed suspension, (4) provide the monitoring attorney with complete access to his client-trust-account and business-account records, including all records required to be maintained under Prof.Cond.R. 1.15, and (5) complete three hours of CLE focused on law-office management and three hours focused on client-trust-account management in addition to the requirements of Gov.Bar R. X. If Eppley fails to comply with the conditions of the stay, the stay will be lifted and he will be required to serve the full two-year suspension. Costs are taxed to Eppley.

Judgment accordingly.

_____

Maria C. Palermo, Bar Counsel; and Robert A. Klingler Co., L.P.A., and Robert A. Klingler, for relator.

Mark Carter Eppley, pro se.

_____