**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Harvey*, Slip Opinion No. 2026-Ohio-2047.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-2047

DISCIPLINARY COUNSEL *v.* HARVEY.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Harvey*, Slip Opinion No. 2026-Ohio-2047.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including misappropriating client funds—Permanent disbarment.*

(No. 2025-0207—Submitted April 1, 2025—Decided June 4, 2026.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-013.

_____

KENNEDY, C.J., authored the opinion of the court, which FISCHER, MILLER, DETERS, HAWKINS, and SHANAHAN, JJ., joined. DEWINE, J., concurred in part and dissented in part and would adopt the recommendation of the Board of Professional Conduct to impose an indefinite suspension with the reinstatement conditions recommended by the board but would not grant credit for the time served under the

interim felony suspension imposed on September 26, 2024. MARK C. MILLER, J., of the Third District Court of Appeals, sat for BRUNNER, J.

**KENNEDY, C.J.**

{¶ 1} Respondent, Nathan Todd Harvey, of Bidwell, Ohio, Attorney Registration No. 0102446, was admitted to the practice of law in Ohio in 2022.

{¶ 2} On September 26, 2024, we imposed an interim felony suspension on Harvey's license to practice law following his conviction on a single count of theft by deception, a third-degree felony. *See In re Harvey*, 2024-Ohio-4668, ¶ 2. That suspension remains in effect.

{¶ 3} In an April 2024 complaint, relator, disciplinary counsel, alleged that the conduct underlying Harvey's criminal conviction—the theft of more than $225,000 from a probate estate for which he served as the administrator—also violated five professional-conduct rules. Harvey waived the determination of probable cause and admitted the alleged misconduct in his answer. The parties entered into stipulations of fact, misconduct, and aggravating and mitigating factors.

{¶ 4} Harvey was the only witness to testify at the hearing before a three-member panel of the Board of Professional Conduct. Based on his testimony and the stipulated evidence, the panel found that Harvey committed the charged misconduct and recommended that he be indefinitely suspended from the practice of law. The panel also recommended that he receive credit for the time he has served under his interim felony suspension and that certain conditions related to his mental health be placed on his reinstatement to the practice of law. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. No objections were filed.

{¶ 5} After independently reviewing the record and our applicable precedent, we adopt the board's findings of misconduct but reject its recommended

sanction. We conclude that the only appropriate sanction for Harvey's misconduct is permanent disbarment.

## I. MISCONDUCT

{¶ 6} In 2019, shortly before beginning law school, Harvey started working as an investigator and legal assistant at the Britt T. Wiseman Law Office.

{¶ 7} On March 19, 2020, Jason H. Sheppard Jr., died intestate. In June, Sheppard's neighbor, who had served as his emergency guardian, asked Britt Wiseman to handle Sheppard's estate.

{¶ 8} On June 2, Harvey signed a fiduciary's acceptance acknowledging that he would keep all estate funds in a separate estate account and would obtain court approval prior to any personal purchases or payment of attorney fees.

{¶ 9} On July 8, a certificate of Sheppard's death was filed in the Gallia County Court of Common Pleas, Probate and Juvenile Division. On that same date, Wiseman and Harvey signed and filed an application for authority to administer Sheppard's estate. Harvey signed as the applicant, and Wiseman signed as the attorney for the applicant. Attached to the application was a fiduciary's bond issued by the Erie Insurance Company.

{¶ 10} On August 18, Judge Thomas S. Moulton Jr. entered letters of authority appointing Harvey as the fiduciary to administer Sheppard's estate. On that same date, Harvey filed the fiduciary's acceptance with the court.

{¶ 11} On August 20, Harvey opened a checking account for the Sheppard estate, into which he began depositing estate funds from accounts that Sheppard had maintained during his lifetime. Five days later, Harvey deposited $230,022.62 into the estate's checking account and then immediately began stealing from the account by using it to autopay his own personal utility bills.

{¶ 12} On October 16, Harvey completed his National Conference of Bar Examiners application to register as a candidate for admission to the practice of law. Question No. 37 asked, "Within the past five years, have you exhibited any

conduct or behavior that could call into question your ability to practice law in a competent, ethical, and professional manner?" Harvey answered "No." Question No. 39 asked, "Within the past five years, have you engaged in any conduct that . . . resulted in . . . any investigation . . . by an employer . . . or . . . endangered the safety of others, *breached fiduciary obligations*, or constituted a violation of workplace or academic conduct rules." (Emphasis added.) Harvey answered "Yes" to this question. The final sentence of question No. 39 stated that if the applicant answered "Yes" to the question, the applicant was to "provide a *complete* explanation and include all defenses or claims that [the applicant] offered in mitigation or as an explanation for [the] conduct." (Emphasis added.) The only issue Harvey raised in his explanation was an investigation at Buckeye Hill Career Center, where he had previously worked. He did not disclose his theft from the Sheppard estate.

{¶ 13} Then, on March 19, 2021, Harvey began stealing more money from the Sheppard estate's checking account by writing checks to himself. In some of the memo fields, he wrote "atty fee," "executor fee," or "fiduciary fee." These supposed fees were neither earned by Harvey nor approved by the probate court.

{¶ 14} In August 2021, Harvey registered with this court as a certified legal intern. As part of that process, he signed an oath to be bound by the Rules of Professional Conduct. On September 9, this court issued Harvey a legal-intern certificate, *see* Gov.Bar R. II.

{¶ 15} Then, on February 22, 2022, Harvey signed a supplemental character questionnaire as part of his application to take the Ohio bar examination. The questionnaire contained the following statement just above the signature line: "Being first duly cautioned, I hereby swear or affirm that I have read the foregoing document and have answered all questions fully and frankly. The answers are complete and true of my own knowledge." Question No. 9 asked, "Since filing the Registration Application, have you exhibited any conduct or behavior that could

call into question your ability to practice law in a competent, ethical, and professional manner?" And question No. 11(a) asked, "Since filing the Registration Application, have you engaged in any conduct that . . . endangered the safety of others, breached fiduciary obligations, or constituted a violation of workplace or academic conduct rules?" In response to both questions, Harvey answered, "No."

{¶ 16} After final approval of his character, fitness, and moral qualifications by the Board of Commissioners on Character and Fitness, *see* Gov.Bar R. I(3)(D), Harvey took and passed the July 2022 Ohio bar examination.

{¶ 17} On October 31, Harvey opened an IOLTA in his name, doing business as Nathan T. Harvey, Attorney at Law. The next month, he was admitted to the practice of law in Ohio.

{¶ 18} On March 14, 2023, using the Sheppard estate's checking account and without approval of the probate court, Harvey wrote a check to himself in the amount of $8,000 and deposited that check into his IOLTA. Before this deposit, Harvey had only $12 in his IOLTA. On that same day, he transferred $300 from his IOLTA into his joint-marital checking account and $4,000 from his IOLTA into his son's bank account. Harvey made additional transfers from his IOLTA to the joint-marital checking account on March 17 and March 21, totaling $2,000. After those transfers, $1,700 in stolen estate funds remained in Harvey's IOLTA.

{¶ 19} In late March or early April, Harvey accepted a position at the Delaware City Attorney's Office to serve as an assistant prosecutor in the municipal court.

{¶ 20} On April 4, while Harvey was still employed by Wiseman, two events occurred. One event occurred when, having $1,700 in funds stolen from Sheppard's estate in his IOLTA, Harvey transferred $500 from his IOLTA to his joint-marital checking account. After that transfer, $1,200 of the stolen estate funds remained in Harvey's IOLTA.

**{¶ 21}** The other event occurred at a little after 2:00 p.m. when Wiseman emailed Harvey, telling him: "I was reviewing the estate checking account information for Jason Sheppard this morning. I noticed several administrator's fee payments made to you. From what I can decipher these were all made in 2023. I assume these were made in error. *These funds need returned to the estate checking account immediately.*" (Emphasis added.) Thirteen minutes later, Harvey responded, "*I will look into it and correct immediately.*" (Emphasis added.)

**{¶ 22}** Then, just before 5:00 p.m., Wiseman and Harvey had the following text-message exchange:

Wiseman: Do you understand the gravity of the problem I now have in this estate?

Harvey: I do[.] I'll fix it[.]

Wiseman: How? I just went through every statement from September 2020 to today.

Harvey: I understand. Are you going to be here Thursday where we can talk in person? I understand the gravity but I can make it right.

Wiseman: Have you done this in any other estate or guardianship we have? I have to know.

Harvey: No. I swear.

Wiseman: There is in excess of 195k missing that you wrote to yourself.

Harvey: Jesus. I'll clear over 300 on the sale of this house. We'll just have to rent. Please just let me make it right.

{¶ 23} Later that day, Wiseman terminated Harvey's employment with his law office. Harvey texted Wiseman again and asked, "Are you willing to meet and discuss your plans moving forward?"

{¶ 24} The next day, Wiseman was not able to locate the file for the Sheppard estate in his law office. He then discovered—through a text exchange with Harvey—that Harvey had removed the file from the office and put it in the garage at his home:

> Wiseman: I can't find the Sheppard estate file. Do you have it? If so, I need it back immediately.
>
> Harvey: Yes I have it. Can I bring it to you[?]
>
> Wiseman: You can bring it to the front porch. . . . Can you do so now?
>
> Harvey: It's in the garage. I'm okay [sic] get it gathered up. Is 195 the number? I can deposit it in a couple days from my dad.

{¶ 25} At his disciplinary hearing before a panel of the Board of Professional Conduct, Harvey testified that when he sent Wiseman the text message saying that he could deposit $195,000 into the Sheppard estate's checking account, he did not know how much money he had actually stolen. There is a discrepancy in the record, however, regarding whether Harvey knew that the $195,000 amount did *not include* the money he had stolen to pay his own personal utility bills.

{¶ 26} In response to questions asked by disciplinary counsel, Harvey admitted that when Wiseman initially confronted him about the unauthorized checks, he "did not disclose [his] unauthorized withdrawals to make [his] utility payments." Harvey also acknowledged that when he responded to disciplinary counsel regarding the grievance Wiseman had filed, he did not self-report the money he had stolen to pay his own utility bills. At his disciplinary hearing,

however, he testified that he thought that a revised figure of $203,000 that Wiseman had given him included the utility-bill autopayments because the amount had grown from the initial $195,000 figure, although Harvey acknowledged that he did not actively seek to confirm that.

{¶ 27} After a criminal investigation was initiated, the actual breadth of Harvey's theft scheme was revealed. Over two years and eight months, 53 autopayments totaling $22,570.03 were made from the Sheppard estate's checking account to pay Harvey's personal utility bills, and he also wrote 32 checks totaling $203,260 to himself for unearned administrator fees.

{¶ 28} The chronology and extent of Harvey's thefts are captured in the following charts, which the parties stipulated to. The first chart shows the funds that Harvey stole to pay his utility bills:

| | Date of Withdrawal | Utility | Amount |
|---|---|---|---|
| 1. | Aug. 25, 2020 | Columbia Gas | $305.00 |
| 2. | Aug. 25, 2020 | AEP | $853.89 |
| 3. | Sept. 22, 2020 | AEP | $846.93 |
| 4. | Oct. 13, 2020 | Columbia Gas | $256.00 |
| *(Oct. 29, 2020 Application to Register for Admission)[2]* | | | |
| 5. | Nov. 12, 2020 | AEP | $677.33 |
| 6. | Jan. 8, 2021 | AEP | $374.92 |
| 7. | Jan. 8, 2021 | Columbia Gas | $384.00 |
| 8. | Feb. 9, 2021 | AEP | $496.20 |
| 9. | Mar. 22, 2021 | AEP | $704.01 |
| 10. | Apr. 19, 2021 | AEP | $200.72 |
| 11. | Apr. 19, 2021 | Columbia Gas | $518.00 |
| 12. | Jun. 11, 2021 | Columbia Gas | $390.00 |
| 13. | Jun. 14, 2021 | AEP | $224.79 |
| 14. | Jul. 16, 2021 | AEP | $1,000.00 |
| 15. | Aug. 3, 2021 | AEP | $307.89 |
| 16. | Aug. 10, 2021 | Columbia Gas | $281.00 |
| *(Aug. 18, 2021 Oath of Legal Intern)[3]* | | | |
| 17. | Sept. 10, 2021 | AEP | $852.16 |
| 18. | Sept. 16, 2021 | Columbia Gas | $178.00 |
| 19. | Sept. 16, 2021 | AEP | $912.97 |
| 20. | Oct. 22, 2021 | Columbia Gas | $178.00 |
| 21. | Oct. 22, 2021 | AEP | $615.94 |
| 22. | Nov. 22, 2021 | Columbia Gas | $178.00 |
| 23. | Nov. 22, 2021 | AEP | $503.85 |
| 24. | Dec. 17, 2021 | AEP | $508.87 |
| 25. | Jan. 24, 2022 | Columbia Gas | $356.00 |

| 26. | Jan. 31, 2022 | AEP | $521.09 |
|---|---|---|---|
| 27. | Feb. 22, 2022 | Columbia Gas | $178.00 |
| *(Feb. 24, 2022 Application to Take the Bar Examination)[4]* | | | |
| 28. | Mar. 11, 2022 | AEP | $465.47 |
| 29. | Mar. 23, 2022 | Columbia Gas | $211.00 |
| 30. | Mar. 28, 2022 | AEP | $392.32 |
| 31. | Apr. 22, 2022 | Columbia Gas | $224.00 |
| 32. | May 11, 2022 | AEP | $274.30 |
| 33. | May 23, 2022 | Columbia Gas | $224.00 |
| 34. | May 31, 2022 | AEP | $312.43 |
| 35. | Jun. 22, 2022 | Columbia Gas | $224.00 |
| 36. | Jun. 30, 2022 | AEP | $607.90 |
| 37. | Jul. 22, 2022 | Columbia Gas | $216.20 |
| 38. | Aug. 1, 2022 | AEP | $953.43 |
| 39. | Aug. 22, 2022 | Columbia Gas | $281.00 |
| 40. | Sept. 1, 2022 | AEP | $910.63 |
| 41. | Sept. 21, 2022 | Columbia Gas | $281.00 |
| 42. | Oct. 11, 2022 | AEP | $859.33 |
| 43. | Oct. 20, 2022 | Columbia Gas | $281.00 |
| 44. | Oct. 28, 2022 | AEP | $515.84 |
| *(Nov. 14, 2022 Admission to the Practice of Law)[5]* | | | |
| 45. | Nov. 18, 2022 | Columbia Gas | $281.00 |
| 46. | Dec. 21, 2022 | Columbia Gas | $281.00 |
| 47. | Jan. 13, 2023 | AEP | $349.19 |
| 48. | Jan. 24, 2023 | Columbia Gas | $281.00 |
| 49. | Feb. 3, 2023 | AEP | $455.39 |
| 50. | Feb. 22, 2023 | Columbia Gas | $281.00 |
| 51. | Mar. 6, 2023 | AEP | $294.57 |
| 52. | Mar. 23, 2023 | Columbia Gas | $16.00 |
| 53. | Mar. 27, 2023 | AEP | $293.47 |
| **Total** | | | **$22,570.03** |

(Text of footnotes omitted.)

{¶ 29} The second chart shows the funds that Harvey stole by writing checks to himself from the Sheppard estate's checking account:

| | Date of Check | Check No. | Amount | Memo |
|---|---|---|---|---|
| | *(Oct. 29, 2020 Application to Register for Admission)[6]* | | | |
| 1. | Mar. 19, 2021 | 1017 | $4,000 | Executor fee |
| 2. | Apr. 6, 2021 | 1020 | $3,260 | Exec fee |
| 3. | May 3, 2021 | 1021 | $9,000 | Fiduciary fee |
| 4. | May 27, 2021 | 1024 | $5,000 | Fid fee |
| 5. | June 15, 2021 | 2 | $5,000 | Admin fee Category 3 |
| 6. | July 5, 2021 | 3 | $2,000 | Fid fee |
| 7. | Aug. 9, 2021 | 2 | $5,000 | Adm fee |
| | *(Aug. 18, 2021 Oath of Legal Intern)[7]* | | | |
| 8. | Oct. 15, 2021 | 2 | $5,000 | Exec fee |
| 9. | Nov. 29, 2021 | 1005 | $6,000 | Ex fee |
| 10. | Dec. 16, 2021 | 1006 | $5,000 | Ex fee |
| 11. | Dec. 28, 2021 | 1001 | $5,000 | Ex fee |
| 12. | Feb. 2, 2022 | 1008 | $7,000 | |
| 13. | Feb. 22, 2022 | 1002 | $5,000 | |
| | *(Feb. 24, 2022 Application to Take the Bar Examination)[8]* | | | |
| 14. | Mar. 14, 2022 | 1003 | $7,000 | Exec fee |
| 15. | Apr. 18, 2022 | 103 | $5,000 | |
| 16. | May 3, 2022 | 104 | $5,000 | Fid fee |
| 17. | May 15, 2022 | 106 | $5,000 | Atty fee |
| 18. | May 29, 2022 | 109 | $8,500 | |
| 19. | June 28, 2022 | 112 | $5,000 | |
| 20. | July 22, 2022 | 115 | $8,000 | Ex fee |
| 21. | Aug. 1, 2022 | 117 | $6,000 | Ex fee |
| 22. | Aug. 23, 2022 | 121 | $8,000 | Ex fee |
| 23. | Sept. 6, 2022 | 122 | $6,000 | |
| 24. | Oct. 11, 2022 | 124 | $7,000 | Executor fee |
| 25. | Nov. 1, 2022 | 1002 | $8,000 | Atty fee |
| | *(Nov. 14, 2022 Admission to the Practice of Law)[9]* | | | |
| 26. | Nov. 17, 2022 | 1003 | $8,000 | Atty fee |
| 27. | Dec. 6, 2022 | 1005 | $8,000 | Atty fee |
| 28. | Jan. 3, 2023 | 1006 | $8,000 | Atty fee |
| 29. | Jan. 26, 2023 | 1004 | $8,500 | Atty fee |
| 30. | Feb. 1, 2023 | 1008 | $9,000 | Fiduciary fee |
| 31. | Feb. 24, 2023 | 1 | $9,000 | Atty fee |
| 32. | Mar. 14, 2023 | 4 | $8,000 | Deposit |
| **Total** | | | **$203,260** | |

(Text of footnotes omitted.)

{¶ 30} On April 7, 2023, Wiseman filed his grievance. In the grievance, Wiseman stated that he had reviewed bank statements for the Sheppard estate and discovered that Harvey "had *written numerous checks* to himself for 'executor fees', 'admin. fees' or miscellaneous memo lines." (Emphasis added.) The fees, Wiseman explained, had not been approved by the probate court, and he provided disciplinary counsel with a list of the checks for the unauthorized fees: "2021: $54,260 (11 checks); 2022: $106,500 (16 checks); 2023[:] $42,500 (5 checks)."

{¶ 31} In his grievance, Wiseman then stated, "Upon my discovery of the misappropriation . . . I confronted Mr. Harvey about the matter to which he did not deny the same and asked for the opportunity to 'make it right.' " He further explained, "Despite knowing Mr. Harvey for over 12 years I knew that I could not allow him to do so and that I was under an ethical duty to report the same. Mr. Harvey has since reached out offering to pay back the money, but I have not responded to this offer as I believe it would be improper/unethical for me to do so."

{¶ 32} On April 26, 22 days after Wiseman confronted Harvey about writing checks to himself for administrator fees and demanded the return of estate funds, Harvey converted the $1,200 in stolen funds remaining in his IOLTA to his personal use when he transferred the funds to his joint-marital checking account.

{¶ 33} On May 10, Harvey emailed disciplinary counsel, stating, "The allegation[s] in [the] grievance filed by Mr. Wiseman are true. He has since sent me a letter requesting repayment of these funds. I have made arrangements to make such payment and expect that to be finalized any day."

{¶ 34} On May 30, Harvey gave Wiseman a certified check for $203,260, which Wiseman then deposited into the estate's checking account. Those funds came from Harvey's father but did not cover the full amount that Harvey had stolen from the Sheppard estate.

{¶ 35} When asked at his disciplinary hearing how he was going to repay his father, Harvey testified, "I hope to be able to make him payments once I can

establish regular employment. I've been working seasonally and temporary jobs since." The outstanding balance due to the Sheppard estate, $22,570.03, was paid by Erie Insurance under the fiduciary-insurance contract.

{¶ 36} During the hearing, disciplinary counsel asked Harvey whether he had used the stolen proceeds to pay his law-school tuition, which had been roughly $30,000 a semester according to Harvey. In response, Harvey stated, "Among other things."

{¶ 37} Later, however, in response to a question from a panel member, Harvey explained that he had not used the stolen estate funds to pay for his law-school tuition. He said that he had used student loans to pay his law-school tuition and that those loans were on an "income-driven repayment plan." The "other things" that Harvey used the stolen estate funds to pay for included household bills, credit-card bills, and general expenses. Harvey testified that during the time he stole from the estate's checking account, his wife was employed. He did not volunteer, nor was he asked, how much she earned.

{¶ 38} Harvey told the panel that he took a "pretty sizeable pay cut to go work with [Wiseman] and go to law school" and that he "supplement[ed]" his family's living expenses with his student loans. He stated that he was trying to "maintain" the lifestyle his family had enjoyed before he attended law school. Harvey did not disclose, and he was not asked at his disciplinary hearing, how much he was earning before he attended law school, what living expenses he was paying with his student loans, or what his lifestyle was prior to law school.

{¶ 39} Harvey also told the panel that his marriage was "rough." He testified: "[My wife] . . . never had an understanding of our finances, didn't care to. Her cards worked when she wanted them to. She—we went on vacation once or twice a year. We obviously used—you see the electric bills and things like that. Thousand-dollar electric bill. Mortgage payments. Her credit cards—she, I think, spent money—shopping was her therapy."

{¶ 40} Harvey further testified: "I would say [to my wife], 'We need to not spend money,' but I wasn't brave enough to ever say, 'We just don't have it' for fear of breaking up the family. She was always, always on the cusp of leaving and always kind of spending money she thought we would make soon."

{¶ 41} Harvey acknowledged that during his ongoing theft of estate funds, there were no unusual family expenses, such as medical expenses, and that his undergraduate student loans had been in deferment. According to Harvey, however, his misconduct never would have happened had he not been married.

{¶ 42} In January 2024, Harvey's wife filed for divorce. Following the divorce, each party took the credit-card debt that was in his or her name. At the time of Harvey's disciplinary hearing, he had $33,000 in credit-card debt in his name. Harvey did not volunteer, nor was he asked, how much credit-card debt was in his wife's name. Harvey testified that his wife had also received the martial residence with the stipulation that if she ever sold the residence, he would be entitled to "$50,000 or something."

{¶ 43} In July 2024, Harvey entered a guilty plea before the Gallia County Court of Common Pleas to one count of theft by deception, a felony of the third degree, and on September 18, he was sentenced to 60 months of community control.

{¶ 44} Under Gov.Bar R. V(18), the board informed this court that Harvey had been convicted of theft by deception. We entered an interim-felony-suspension order on September 26. *See In re Harvey*, 2024-Ohio-4668. Accordingly, the clerk of this court sent Harvey a copy of the order by certified mail to his personal address and to his law firm, informing Harvey that he was required to notify any clients or cocounsel of his suspension, return all client property, refund any unearned fees, notify opposing counsel of his suspension, send all such notices by certified mail, file with the clerk of this court and relator an affidavit showing proof of compliance, and retain and maintain a record of the steps taken to carry out the order. *See id*. at ¶ 12-18.

{¶ 45} On October 4, that letter was returned as undeliverable to one of the addresses. However, Harvey had to have been aware that this court sent him the order—it was an exhibit to which he stipulated before his October 28 disciplinary hearing.

{¶ 46} In November, we issued a show-cause order instructing Harvey to explain why he should not be found in contempt for failing to file an affidavit of compliance. Harvey did not respond to that order either, as copies sent to separate addresses were both returned as undeliverable. This court found him in contempt on December 4 for his failure to file an affidavit of compliance. *See In re Harvey*, 2024-Ohio-5666. Since then, Harvey has remained in contempt.

{¶ 47} Among the stipulated exhibits is a letter, dated October 8, 2024, from psychologist Donald E. Newberry, Ph.D. Dr. Newberry stated that he was providing the letter at Harvey's request and "in follow up to services provided" to him. Dr. Newberry explained that he had diagnosed Harvey with major depressive disorder and posttraumatic stress disorder ("PTSD"). Dr. Newberry did not assert that Harvey's disorders had any causal connection to his theft. *See* Gov.Bar R. V(13)(C)(7)(b) (in order for an attorney's mental disorder to qualify as a mitigating factor under Gov.Bar R. V(13)(C)(7), there must be, among other things, "[a] determination that the disorder contributed to cause the misconduct").

{¶ 48} At his disciplinary hearing, Harvey told the panel that he was diagnosed with major depressive disorder and PTSD in June 2023. According to Harvey, a lot of things triggered his PTSD, which he said was "cumulative from [his] childhood and [his] relationship with [his] mother." And he claimed he was experiencing symptoms "long before" his PTSD diagnosis.

{¶ 49} When asked to tell the panel more about his conditions, Harvey stated that the major depressive order was "something that just exists deeply in [his] family. That's probably just always been there."

{¶ 50} As for the PTSD, Harvey testified that it was "kind of aggravating

[his depression]." He then explained, "[M]y last several years as a deputy [sheriff] . . . I was the midnight shift supervisor. And I just . . . didn't care about my life. I had suicidal ideations every day for ten years." He added, "I was not wearing a vest at work, snatching guns out of people's hands, driving 100 miles an hour everywhere, just being very reckless."

{¶ 51} According to Harvey, during the ten years he served at the sheriff's office, he "probably investigated 100 suicides and homicides." And he testified that his "friend drowned in [a] river chasing a subject who tried to swim over to [an] island," adding that he was "one of two people that pulled his body back into the boat. And . . . things just spiraled from that." He then explained, "But at that time, we were locking it away, just acknowledging it."

{¶ 52} Harvey testified that he was hospitalized for a week in December 2023 "due to [his] mental health" and that he "remember[ed] telling [his] therapist in the hospital that [he] just—[he] always knew that [he] would die in some tragic way. It wouldn't be—[he] wouldn't be old and—you know, [die] naturally."

{¶ 53} In Harvey's application to register as a candidate for admission to the practice of law, he listed a series of employers. From May 2005 through November 2015, he served as a deputy sheriff in the Gallia County Sheriff's Office. And after he began teaching on a full-time basis, he remained an auxiliary deputy in the training program as the main firearms instructor. In the education section of the registration application, Harvey indicated that he attended, among other schools, the University of Rio Grande from January 2016 through May 2018, the University of Cincinnati from June 2018 through August 2019, and the Syracuse University College of Law from August 2019 through May 2022.

{¶ 54} From November 2009 through April 2019, Harvey also served as an instructor at the Buckeye Hills Career Center. On his registration application, he indicated that he resigned from that position "while on administrative leave concerning an investigation." In the "Defense or Explanation" section of the

application, Harvey explained that his "criminal justice classroom was shared with the police academy" and that "there was an issue over items . . . appropriate for the police academy [but] not appropriate for high school [that were] left unsecured in the shared classroom." What those "items" were was not disclosed. And then beginning in May 2019, he began serving as an investigator at Wiseman's law office.

{¶ 55} Included in the stipulated exhibits is a letter attesting to Harvey's good character and involvement in the community. When asked at his disciplinary hearing why he had submitted only one letter, Harvey told the panel, "I didn't—I don't really have any people who I felt could offer a character letter that weren't my family. I just didn't think it was appropriate to offer character letters from someone who would be skewed. I—all of my friends prior to me going to law school were all [from the] sheriff's office. And I switched sides and just kind of lost all those relationships."

{¶ 56} At the end of the hearing, a panel member asked disciplinary counsel to articulate the strongest mitigating factors warranting a sanction less severe than disbarment, the presumptive sanction for misappropriating client funds, *see Disciplinary Counsel v. Edwards*, 2012-Ohio-5643, ¶ 18. Disciplinary counsel, while acknowledging that Dr. Newberry's letter and Harvey's testimony did not meet the requirements of Gov.Bar R. V(13)(C)(7), nevertheless argued that Harvey's testimony regarding his mental-health conditions and other personal circumstances—along with his taking full responsibility for his conduct, having a cooperative attitude toward disciplinary proceedings, and making restitution to the Sheppard estate—warranted the imposition of an indefinite suspension rather than disbarment.

{¶ 57} Harvey and disciplinary counsel entered into stipulations—which the board accepted—stating that Harvey had violated five professional-conduct rules: Prof.Cond.R. 1.15(b) (permitting a lawyer to deposit his or her own funds in

a client trust account for the sole purpose of paying or obtaining a waiver of bank service charges), 8.4(b) (prohibiting a lawyer from committing an illegal act that reflects adversely on the lawyer's honesty or trustworthiness), 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice), and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

{¶ 58} With respect to Prof.Cond.R. 8.4(h), this court has held:

> In order to find a violation of Prof.Cond.R. 8.4(h), there must be clear and convincing evidence that the lawyer has engaged in misconduct that adversely reflects on the lawyer's fitness to practice law, even though that conduct is not specifically prohibited by the rules, or there must be proof that the conduct giving rise to a specific rule violation is so egregious as to warrant an additional finding that it adversely reflects on the lawyer's fitness to practice law.

*Disciplinary Counsel v. Bricker*, 2013-Ohio-3998, ¶ 21. Here, the parties stipulated and the board found that Harvey's conduct also satisfied *Bricker* and that it therefore violated Prof.Cond.R. 8.4(h).

{¶ 59} We adopt the board's findings of misconduct.

## II. SANCTION: ALL RELEVANT FACTORS

{¶ 60} """"Each disciplinary case involves unique facts and circumstances."""" *Disciplinary Counsel v. Fusco*, 2025-Ohio-5397, ¶ 14, quoting *Disciplinary Counsel v. Nowicki*, 2023-Ohio-3079, ¶ 35 (Kennedy, C.J., concurring in part and dissenting in part), quoting Gov.Bar R. V(13)(A). "When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed

in Gov.Bar R. V(13), and the sanctions imposed in similar cases," *Disciplinary Counsel v. Bereday*, 2019-Ohio-1895, ¶ 11, "'to ensure a fair and equitable disciplinary system,'" *Fusco* at ¶ 14, quoting *Nowicki* at ¶ 35 (Kennedy, C.J., concurring in part and dissenting in part).

{¶ 61} Aggravating factors weigh in favor of the board's "recommending a more severe sanction." Gov.Bar R. V(13)(B). Mitigating factors weigh in favor of the board's "recommending a less severe sanction." Gov.Bar R. V(13)(C). "The importance or weight of a mitigating or aggravating factor depends on the facts of the case." *Nowicki* at ¶ 59 (Kennedy, C.J., concurring in part and dissenting in part).

## A. Aggravating Factors

{¶ 62} The parties stipulated and the board found that three aggravating factors are present in this case: Harvey had a dishonest or selfish motive, engaged in a pattern of misconduct, and committed multiple offenses, *see* Gov.Bar R. (V)(13)(B)(2) through (4). We agree that these aggravating factors are present here.

{¶ 63} However, this court may find that additional aggravating factors are present beyond those found by the board. *See Cleveland Metro. Bar Assn. v. Johnson*, 2010-Ohio-4832, ¶ 18 ("in addition to the aggravating factors found by the board . . . we consider [the] respondent's pattern of misconduct involving multiple offenses as factors in aggravation"); *Cleveland Metro. Bar Assn. v. Donchatz*, 2017-Ohio-2793, ¶ 43 ("in addition to the aggravating factors noted by the board, we find that [the respondent] also submitted false statements and engaged in other deceptive practices during the disciplinary process").

{¶ 64} We find that three additional aggravating factors are present here: the submission of false statements during the disciplinary process, Gov.Bar R. V(13)(B)(6), a refusal to acknowledge the wrongful nature of the conduct, Gov.Bar R. V(13)(B)(7), and a failure to make restitution, Gov.Bar R. V(13)(B)(9).

*1. False Statements During the Disciplinary Process*

{¶ 65} Based on a review of the entire record, we find the aggravating factor that Harvey made false statements during the disciplinary process, *see* Gov.Bar R. V(13)(B)(6).

{¶ 66} After a close read of Wiseman's email, text messages, and grievance quoted in Part I of this opinion, it is apparent that for purposes of the grievance he filed, Wiseman identified only the checks that Harvey wrote to himself for administrator fees—*not* the payments Harvey made for his personal utility bills. During Harvey's disciplinary hearing, in response to a question from disciplinary counsel, Harvey admitted that he had not self-reported the estate assets that he had stolen to pay his utility bills. Later, however, Harvey told the panel that he thought the $195,000 amount that Wiseman initially gave him included the payments for his utility bills because Wiseman had "thrown numbers at [him] that grew." But Harvey's testimony is simply not credible.

{¶ 67} The email and text messages Wiseman sent Harvey and the grievance he submitted to disciplinary counsel were very specific. They addressed only *the checks* that Harvey had written to himself for unearned administrator fees. Harvey could not have reasonably believed that the $195,000 amount Wiseman referred to included the utility-bill payments, because Harvey never wrote checks for those bills. Those payments were automatically deducted from the Sheppard estate's checking account. The only checks Harvey wrote to himself from the estate's checking account were for administrator fees. Therefore, Harvey's testimony during his disciplinary hearing that he believed that the $195,000 amount included the utility-bill payments was false, providing sufficient evidence of the aggravating factor of submitting false statements during the disciplinary process, *see* Gov.Bar R. V(13)(B)(6).

### 2. Refusal to Acknowledge Wrongful Nature of the Conduct

{¶ 68} When a respondent uses deflection to blame someone else for his or her misdeeds, has he or she truly acknowledged the wrongful nature of the conduct? We considered that question in *Erie-Huron Counties Bar Assn. v. Evans*, 2009-Ohio-4146. During his disciplinary proceedings, Evans placed the responsibility for his neglect of legal matters on others, "including former associates, secretaries, courts, and judges." *Id*. at ¶ 22. This court agreed with the board's determination that Evans had thereby refused to acknowledge the wrongful nature of his conduct. *Id*. at ¶ 24, 26.

{¶ 69} Here, Harvey's May 10, 2023 email response to disciplinary counsel contained three sentences: "The allegation[s] in this grievance filed by Mr. Wiseman are true. He has since sent me a letter requesting repayment of these funds. I have made arrangements to make such payment and expect that to be finalized any day." On its face, Harvey's response acknowledged the wrongful nature of his conduct, but Harvey's attitude changed during his disciplinary hearing. At the hearing, Harvey did everything but acknowledge the wrongful nature of his conduct. Instead, he deflected. And in the end, Harvey suggested that the people responsible for his misconduct were his family, especially his wife.

{¶ 70} For example, when a panel member asked Harvey where the stolen estate funds had gone, he told the panel that he had taken a "pretty sizable" pay cut to attend law school but was nevertheless trying to "maintain" the lifestyle his family had enjoyed prior to his attending law school. He further explained that he was using his law-school student loans to supplement his household living expenses.

{¶ 71} When pressed about where the money had gone, Harvey first pointed to his mortgage payments, car payments, utilities, and vacations. He then shifted the blame to his wife, suggesting that she spent money freely and used shopping as "therapy." He claimed that he wanted to speak with her about their finances but

was worried about tearing the family apart since she was "always on the cusp of leaving."

{¶ 72} And when asked by another panel member to explain his financial situation and why he was stealing estate funds, Harvey testified that it basically came down to his marriage. According to Harvey, his misconduct never would have happened but for his marriage. So, in the end, Harvey maintained that his wife deserved the blame for his conduct—not himself.

{¶ 73} Harvey's stipulation to five rule violations does not acknowledge the wrongful nature of his misconduct. And his effort to deflect blame by insinuating that his wife was responsible for his actions is diametrically opposed to fully acknowledging the wrongful nature of his conduct. Therefore, Harvey's suggestion that his wife was responsible for his misappropriation of more than $200,000 in client funds is sufficient evidence of his refusal to acknowledge the wrongful nature of the conduct, *see* Gov.Bar R. V(13)(B)(7).

### 3. Failure to Make Full Restitution

{¶ 74} "A failure to make restitution" is an aggravating factor under Gov.Bar R. V(13)(B)(9). And in interpreting BCGD Proc.Reg. 10(B)(1)(i) (the predecessor to Gov.Bar R. V(13)(B)(9)) in *Disciplinary Counsel v. Anthony*, 2013-Ohio-5502, ¶ 12, this court concluded that the attorney's failure to make *full* restitution was an aggravating factor. In that case, Anthony owed restitution to both the church that he had embezzled from and the insurance company that later paid an employee-dishonesty claim as a result of his theft. *Id*. at ¶ 7-8. However, at the time the court issued its decision in his case, Anthony had repaid only a portion of what he owed the church and his insurer. *Id*. at ¶ 8. We therefore held that the aggravating factor of failure to make restitution applied to Anthony's case. *Id*. at ¶ 12.

{¶ 75} Like Anthony, Harvey failed to make full restitution. The undisputed evidence shows that Harvey's father paid the restitution owed for the checks that

Harvey wrote to himself for unearned administrator fees. At the time of Harvey's disciplinary hearing, however, Erie Insurance had made the Sheppard estate whole by paying on a claim against the fiduciary-insurance policy. It reimbursed the estate $22,570.03 for the funds that Harvey had stolen to pay his utility bills. And at the time of his hearing, Harvey had not paid Erie Insurance back. Therefore, based on this court's precedent, there is sufficient evidence of this additional aggravating factor, *see* Gov.Bar R. V(13)(B)(9). And for this same reason, the mitigating factor of paying restitution does not apply, *see* Gov.Bar R. V(13)(C)(3).

### B. Mitigating Factors

{¶ 76} The board found that four mitigating factors are present in this case: Harvey had no prior disciplinary record, made full and free disclosure to the board or exhibited a cooperative attitude toward the disciplinary proceedings, presented evidence of his good character or reputation, and had other penalties or sanctions imposed for his misconduct. *See* Gov.Bar R. V(13)(C)(1) and (4) through (6). And while the board found that Harvey did not prove the existence of a qualifying mental-health disorder to support mitigation under Gov.Bar R. V(13)(C)(7), the board gave significant weight to this nonfactor and the four mitigating factors to overcome the presumption of disbarment.

{¶ 77} However, as explained above, the evidence does not support finding that Harvey made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings.

{¶ 78} We also disagree with the board with respect to the other three mitigating factors and the mental-health evidence, which deserve little, if any, weight. First, the mitigating factor of the absence of a prior disciplinary record deserves no weight. Second, Harvey's evidence of character and reputation is entitled to little more than negligible weight. Third, we also accord negligible weight to the mitigating factor of the imposition of other penalties or sanctions. And lastly, because neither of Harvey's mental-health disorders qualify as a

mitigation factor under Gov.Bar R. V(13)(C)(7), they carry no weight when measured against the aggravating factors.

### *1. No prior disciplinary record*

{¶ 79} Harvey was admitted to the practice of law in November 2022. At that time, his theft scheme had been ongoing for two years and three months. And Harvey continued stealing assets from the Sheppard estate for another five months after being admitted to the practice of law before finally being caught. But by April 4, 2023, the jig was up.

{¶ 80} Harvey's case appears to be the first of its kind in Ohio, and a disturbing case of first impression it is: a law student who put into action a theft scheme to misappropriate client funds for two years and eight months and did not get caught until (1) *after* this court had certified him as a legal intern who agreed to abide by the Rules of Professional Conduct, (2) *after* his character, fitness, and moral qualifications were approved by the Board of Commissioners on Character and Fitness, (3) *after* this court approved his application to sit for the bar examination, and (4) *after* this court admitted him to the practice of law. We learned only later that Harvey made false statements, perpetuated material omissions, and showed a complete lack of candor on both his application to register as a candidate for admission to the practice of law and his supplemental character questionnaire.

{¶ 81} We accord no mitigating weight to the fact that Harvey lacked a prior disciplinary record during the brief period he was licensed to practice before his long-running theft scheme was discovered.

### *2. Character and reputation*

{¶ 82} Gov.Bar R. V(13)(C)(5) provides that mitigation in favor of a lesser sanction includes evidence of character or reputation. Here, Harvey's evidence of good character and reputation consisted of one letter attesting to his involvement in the local community and devotion to his children. Ultimately, the amount of

mitigating weight given to evidence of good character or reputation depends not on the number of letters submitted but, rather, on whether the evidence is sufficient to temper a presumptive sanction. Here, we do not doubt the sincerity of the author's remarks in the single letter that Harvey submitted.

{¶ 83} However, what is most relevant in this case with respect to Harvey's character and reputation is what he thinks other people think about his character and reputation. When asked during his disciplinary hearing why he did not have more letters attesting to his good character and reputation, he said, "I don't really have any people who I felt could offer a character letter that weren't my family. I just didn't think it was appropriate to offer character letters from someone who would be skewed. I—all of my friends prior to me going to law school were all sheriff's office. And I switched sides and just kind of lost all those relationships."

{¶ 84} Harvey's admitted inability to find nonfamily members to support a finding that he has good character or a good reputation is telling. We give negligible weight to Harvey's evidence of good character and reputation.

### 3. Other penalties or sanctions

{¶ 85} While it is true that Harvey pled guilty to one count of theft by deception, a felony of the third degree, at sentencing he received 60 months of community control and not one day of incarceration. Harvey's theft spanned two years and eight months. He converted more than $225,000 of estate proceeds for his personal use. Harvey committed a theft offense every time his personal utility bills were paid automatically from the estate's checking account and every time he wrote a check without court approval for unearned administrator fees. That is *85 individual acts of theft* in all. The only other penalty or sanction imposed here—a lenient criminal sentence—constitutes negligible mitigation evidence under Gov.Bar R. V(13)(C)(6).

{¶ 86} Compare Harvey's sentence of 60 months of community control to the sentences imposed in cases in which we have found the presence of this

mitigating factor. For instance, in *Disciplinary Counsel v. Thomas*, 2016-Ohio-1582, ¶ 6, the respondent was sentenced to serve four and a half years in prison. And in another case, *Anthony*, 2013-Ohio-5502, at ¶ 4, the attorney served four months in prison for grand theft before his sentence was modified to five years of community control.

{¶ 87} Here, Harvey, spent no time in prison and was instead sentenced to five years of community control. His sentence is not comparable to the sentences imposed in *Thomas* and *Anthony*, and this factor therefore should be accorded only negligible weight.

### 4. Mental-health disorder

{¶ 88} According to disciplinary counsel, the strongest argument in mitigation against disbarment and in favor of the lesser sanction of an indefinite suspension was not actually a mitigating factor under Gov.Bar R. V(13), i.e., Harvey's mental-health disorders diagnosed after he stole the estate assets—namely, PTSD and major depressive order. But this court has drawn a bright line with respect to Gov.Bar R. V(13)(C)(7).

{¶ 89} In order for a mental-health disorder to be a mitigating factor under Gov.Bar R. V(13)(C)(7), "'there must be (a) a diagnosis by a qualified health-care professional, (b) a *causal relationship* between the disorder and the misconduct, (c) a sustained period of successful treatment, and (d) a prognosis from a qualified health-care professional that the attorney will be able to return to the competent, ethical, and professional practice of law.'" (Emphasis added in *Carr*.) *Disciplinary Counsel v. Carr*, 2022-Ohio-3633, ¶ 80, quoting *Warren Cty. Bar Assn. v. Vardiman*, 2016-Ohio-352, ¶ 14, fn. 3. A disorder either meets these elements or it does not. Here, there is no evidence of a *causal relationship* between either of Harvey's diagnoses and his misconduct, *see* Gov.Bar R. V(13)(C)(7)(b).

{¶ 90} Therefore, this mitigating factor is inapplicable to this case.

### C.  The Presumptive Sanction of Disbarment Is Appropriate

{¶ 91} "The primary purpose of the disciplinary process is to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship and to allow us to ascertain the lawyer's fitness to practice law." *Disciplinary Counsel v. Sabroff*, 2009-Ohio-4205, ¶ 20.  "The continuing public confidence in the judicial system and the bar requires that the strictest discipline be imposed in misappropriation cases." *Cleveland Bar Assn. v. Belock*, 1998-Ohio-261, ¶ 11.  The presumptive sanction for misappropriation of client funds is permanent disbarment, which "may be tempered with sufficient evidence of mitigating or extenuating circumstances." *Edwards*, 2012-Ohio-5643, at ¶ 18.  Therefore, "our sanctions in misappropriation cases have ranged from disbarment to fully stayed term suspensions." *Trumbull Cty. Bar Assn. v. Dull*, 2017-Ohio-8774, ¶ 11.

{¶ 92} *Edwards* is an example of a misappropriation case in which we found that the presumption in favor of disbarment had been rebutted.  In that case, Edwards had practiced law for more than 30 years without a disciplinary violation, and he had "fully cooperated in relator's investigation, acknowledged the wrongful nature of his conduct, and blame[d] no one but himself for his misconduct." *Edwards* at ¶ 10.  His misappropriation had not harmed clients or their subrogees, he paid full restitution, and he "submitted letters from a colleague, four clients, his two employees, and his pastor attesting to his good character and reputation aside from the charged misconduct." *Id*. at ¶ 10-11.  Edwards also established that his mental disorder qualified as a mitigating factor. *Id.* at ¶ 15.  We explained that "[i]n contrast to these significant mitigating factors, the panel and board found only one aggravating factor—that Edwards engaged in a pattern of misconduct over a one-and-a-half-year period." *Id*. at ¶ 16.

{¶ 93} Harvey's case is nothing like *Edwards*.  Instead, we conclude that the cases in which we disbarred attorneys for misappropriation are most on point

here.

{¶ 94} In *Disciplinary Counsel v. Little*, the attorney "misappropriat[ed] over $363,000 in settlement funds relating to numerous client matters and fail[ed] to maintain adequate records for her client trust account." 2017-Ohio-6871, ¶ 1. Little had a dishonest or selfish motive, committed multiple offenses, engaged in a pattern of misconduct, and failed to make full restitution, and the victims of her misappropriation were vulnerable clients. *Id.* at ¶ 12. She also failed to establish the existence of a disorder that contributed to her misconduct. *Id.* at ¶ 13. The board found that she was not contrite and that part of her disciplinary-hearing testimony was disingenuous and misleading. *Id.* This court concluded, "Given the extent and duration of Little's misappropriations—and that she has not made full restitution—we agree that permanent disbarment is the only appropriate sanction." *Id.* at ¶ 15.

{¶ 95} In *Disciplinary Counsel v. Harter*, the attorney "not only misappropriated client funds but also revealed confidential information regarding multiple clients when he cashed their [Bureau of Workers' Compensation] checks through a client's convenience store." 2018-Ohio-3899, ¶ 34. He also "failed to cooperate in [the] relator's investigation[] and repeatedly made false statements of material fact while testifying under oath." *Id*. And "while the board found that all the aggravating factors enumerated in Gov.Bar R. V(13) were present, Harter presented just one letter attesting to his good character." *Id.* We concluded that disbarment was the appropriate sanction. *Id.*

{¶ 96} In *Cincinnati Bar Assn. v. Sanz*, we disbarred an attorney who, while serving as the trustee of an irrevocable trust, misappropriated more than $180,000 from the trust and failed to respond to the beneficiaries' repeated requests for an accounting. 2011-Ohio-766, ¶ 12. Aggravating factors included a pattern of misconduct involving multiple offenses, failure to cooperate in the disciplinary process, refusal to acknowledge the wrongful nature of the conduct, and the

existence of a selfish motive. *Id.* at ¶ 9-10. There was no evidence of any mitigating factor. *Id.* at ¶ 10.

{¶ 97} Here, Harvey assumed the duties of a fiduciary and immediately violated them by stealing more than $225,000. He had a dishonest and selfish motive, engaged in a pattern of misconduct, committed multiple offenses, submitted false statements during the disciplinary process, failed to acknowledge the wrongful nature of his conduct, and failed to make full restitution. As for mitigation, Harvey did not establish that he had a qualifying mental disorder, and the mitigation evidence presented deserves very little to no weight.

{¶ 98} Accordingly, we conclude that disbarment is the only appropriate sanction for Harvey's misconduct.

### III. CONCLUSION

{¶ 99} In light of Harvey's misconduct, the applicable aggravating factors, and the negligible weight of his mitigation evidence, a deviation from disbarment—the presumptive sanction for misappropriation of client funds—is not warranted, *see Harter*, 2018-Ohio-3899, at ¶ 33.

{¶ 100} Accordingly, Nathan Todd Harvey is hereby permanently disbarred from the practice of law in Ohio. Costs are taxed to Harvey.

Judgment accordingly.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Michelle A. Hall, Assistant Disciplinary Counsel, for relator.

Nathan Todd Harvey, pro se.

_____